BEATRICE RANNEY, as Administratrix of the Estate of DONALD McN. RANNEY, Deceased, Appellant-Respondent, *v.* HABERN REALTY CORPORATION, Appellant, and CLARENCE PARKER et al., Doing Business as A & P CRANE RENTAL Co., et al., Respondents-Appellants. UNITED STONE WORKS, INC., et al., Third-Party Defendants-Respondents.

First Department, February 26, 1952.

*John J. Cunneen* of counsel (*Caverly, Dimond, Dwyer & Lawlor,* attorneys), for Clarence Parker and James L. Gitsman, doing business under the name of A & P Crane Rental Co., respondents-appellants.

*Julius S. Christensen* of counsel (*Christensen & Curtis,* attorneys), for Habern Realty Corporation, appellant.

*Harry Zeitlan* of counsel (*Benjamin H. Siff* with him on the brief; *Abraham H. Leef,* attorney), for Beatrice Ranney, appellant-respondent.

*Harry Schechter* of counsel (*William H. Stieglitz* with him on the brief; *Bernard Katzen,* attorney), for United Stone Works, Inc., third-party defendant-respondent.

*Frank J. Wheelan* of counsel (*George Kohan,* attorney), for Monroe A. Lawrence Building Construction Corp., respondent-appellant.

CALLAHAN, J. These are cross appeals from a judgment entered on the verdict of a jury awarding damages for personal injuries and wrongful death of the plaintiff's intestate allegedly the result of an accident occurring on June 23, 1948.

The plaintiff's intestate was working on top of a sidewalk shed or bridge upon which was being loaded a draft of stone facings weighing approximately a ton and a half. The stone was to be used in the construction of a building at 30th Street and 6th Avenue in the city of New York. The draft was being raised through the medium of a crane with rigging attached, which lifted the stone from the street over the bridge. As it was being lowered to the bridge, a metal cable known as a " choker ", which was sustaining the load, broke. The draft

dropped three or four feet, demolished the platform of the bridge, and caused the deceased and the draft of stones to fall through the bridge. Other stones previously placed on the shed also fell through the hole or opening thus made in the bridge. The deceased was pinned down by some of the heavy stones, each weighing approximately seven to nine hundred pounds. Both of his legs suffered multiple compound fractures, and he had contusions in the area of the shoulder and neck. He was taken to the hospital, where he was confined for approximately ten weeks, and was incapacitated until the time of his death over a year after the accident. Concededly, the decedent died from a cancer, which had spread through his system.

About a year prior to the accident a large wart or mole had appeared on the back of decedent's neck. It was found to be a malignant form of cancer. The mole was excised, and after about six weeks or more the deceased was able to return to work. There was no sign of the mole other than the scar after its excision. A physician called by the plaintiff testified that although all the cancerous cells had been removed, the accident involving a blow at the site of the excised mole caused a new cancer to arise. Though there was an attempt to prove that an arrested cancer had been reactivated, this evidence was not received. An autopsy showed that while death was caused by cancerous cells throughout the vital organs, none were found at the site of the operation. A cancer specialist called by the defendant testified that a trauma could not produce the type of cancer from which the deceased was suffering.

The deceased was employed by the third-party defendant United Stone Works, Inc. (hereinafter called United), which had hired the crane from the defendants Clarence Parker and James L. Gitsman, doing business as A & P Crane Rental Co. (hereinafter called the crane company). The defendant Habern Realty Corporation (hereinafter called Habern) was the owner of the building under construction. It had subcontracted the erection of the sidewalk bridge on which the deceased was standing when the accident occurred. It had also subcontracted the stone work to United. The latter secured the crane from the crane company. The equipment was sent to the job location in charge of an operator and an oiler. The contract for the crane bore an indorsement as follows: "Personnel on this machine is on your payroll [United] and insurance also public liability and property damage." Neither of the men in charge of the crane had ever been employed by United. Nor is there any evidence as to whether they had ever worked for the crane

company, or as to the circumstances under which they came into possession of the crane. These men were put on the payroll and paid by United at all times while the crane was in use on the job.

The decedent was a rigger working for United. There were two other riggers and a stonesetter employed by United on the job. The crane arrived on location the day before the accident. There was evidence that on the first day of operation numerous stones were lifted by the crane under direction of the riggers and placed upon various floors in the building, and some on the bridge. The accident occurred when a second truckload of stones was being hoisted on the second day. Earlier that morning a policeman had complained about the deposit of stones on the street. Thereupon the riggers working for United talked with the superintendent of construction, one Tully, who was Habern's employee, and Tully directed that the stones be taken from the street and stored upon the sidewalk bridge. At least, this was the testimony of the riggers called by the plaintiff. Though denied by Tully, this raised an issue of fact.

Habern, the owner, did none of the work on the building and hired no general contractor, but contracted all of the construction work with various trades. It employed no one but Tully and a laborer or two to clean up debris. It hired the defendant Monroe Lawrence Construction Corporation, an engineering and architectural concern (hereinafter called Monroe), to supervise the construction of the building in order to see that the plans and specifications were carried out.

The case was submitted to the jury upon instructions that it answer numerous specific questions as well as render general verdicts. The jury found in favor of the plaintiff against Habern, the owner, Monroe, the engineer or architect, and the crane company. All of these parties had asserted cross claims against United. The trial court, however, dismissed the cross claims on the basis of the jury's answers to the specific questions submitted to it. On rendition of the verdict the trial court set it aside against Monroe and dismissed the complaint as to this defendant. We think that such dismissal was fully justified on the record before us. There was no prima facie case made out as against Monroe. It had assumed no responsibility for the safety of the work, nor did it take any active part in the events connected with the accident. At this point, therefore, we can eliminate Monroe and its cross claims from further consideration in the case.

Thus, we are left to decide: (1) whether the recovery against Habern, the owner, was warranted on the law and the facts;

(2) whether the recovery against the crane company was warranted on the law and the facts; (3) whether there was sufficient evidence to support the jury's verdict of causal relation between the death from cancer and the accidental injuries; and (4) what disposition should be made of the cross claims.

### (1) *As to Habern Realty Corporation.*

The theory of the plaintiff against Habern as disclosed by the pleadings and on the opening was twofold: (a) that it had negligently constructed the sidewalk bridge and negligently permitted the storage of stone thereon so as to cause overloading, and (b) that Habern had neglected to furnish the plaintiff with a safe place to work, was negligent in furnishing a defective crane, and failed to properly manage and control it.

The case was submitted to the jury on statutory and on common-law negligence as against Habern.

The specific questions submitted to the jury as to this defendant were:

" Question No. 1. Was the Habern Realty Company the owner of the premises in which the accident occurred, negligent in violating Section 200 of the Labor Law?

" Question No. 2. Was the Habern Realty Company the owner of the premises in which the accident occurred, negligent in violating Sections 240 and 241 Subdivision 6 of the Labor Law, and negligent in violating the Administrative Act Section C26–553.0 or Section C26–557.0, or both, or Section C26–551.0?

" Question No. 3. If you find the Habern Realty Company negligent, was such negligence a proximate cause of the accident? "

The jury answered those questions in the affirmative, and also rendered a general verdict for the plaintiff against this defendant.

Section 200 of the Labor Law reads as follows:

" § 200. *General duty to protect health and safety of employees.* All places to which this chapter applies shall be so constructed, equipped, arranged, operated and conducted as to provide reasonable and adequate protection to the lives, health and safety of all persons employed therein. The board shall make rules to carry into effect the provisions of this section."

It has been said that this section is largely declaratory of the common law (*Dittiger* v. *Isal Realty Corp.,* 264 App. Div. 279, revd. on other grounds 290 N. Y. 492).

The place where the decedent was working was the sidewalk bridge. The immediate cause of the collapse of the bridge

was, no doubt, the fall of the draft of stone. But as other stones were stored on the bridge and they fell into the broken area, the jury may have found that their presence was an efficient cause contributing to the injuries suffered by the plaintiff. There is no contention that the bridge was improperly constructed, and it would only be an unsafe place to work, if it was overloaded. It may have been used at Habern's direction as a place for storage of materials in violation of certain city ordinances, but this would relate to a liability created by the ordinance. To avoid repetition we will discuss these questions later in connection with our detailed discussion of the city ordinances.

We turn, therefore, to the second special inquiry submitted to the jury as to whether Habern was negligent in violating sections 240 and 241 of the Labor Law or the provisions of the Administrative Code embraced in the question.

The issue of negligence based on violation of these statutes was presented to the jury as one question without distinguishing between the sections. If there was error in submitting the liability of Habern to the jury on the basis of a violation of any one of the statutes mentioned in this question, this would be reversible error because we would be unable to tell whether the jury's answer was based upon violation of one or both of the sections of the Labor Law aforesaid or violation of one or more of the provisions of the Administrative Code.

We think there was error in the form of submitting the question of liability of this defendant under the Labor Law sections as distinguished from the Administrative Code sections. Broadly speaking, the said sections of the Labor Law apply to the violation of a duty to furnish proper devices such as scaffolds, cranes or rope, and the Administrative Code provisions apply to failure to provide a safe sidewalk bridge or the negligent use of such bridge.

We think it might clarify the issues if we discussed the sections of the Administrative Code first.

These sections, in the order in which they were charged, are as follows:

" § C26–551.0 *Loading of structures during construction or demolition.*— It shall be unlawful to load or cause to be loaded any structure, or any temporary support or scaffolding or any sidewalk or sidewalk shed or bridge or any device or equipment, during construction or demolition, in excess of its safe carrying capacity."

" § C26–555.0 *Construction and maintenance of equipment and safeguards.*— All devices or equipment which are used in connection with the performance of work and regulated by this article, shall be constructed, installed and maintained in a substantial manner and so operated as to give proper protection to persons and shall not be removed, altered, weakened, or rendered inoperative so long as they are needed or in use, except as provided in section C26–553.0, unless so ordered by a person in responsible charge of the operation."

" § C26–557.0 *Protections for sidewalks.*— Whenever a structure is to be constructed to exceed forty feet in height  *  *  * the owner shall erect and maintain safeguards during their period, as defined below, of such work as follows:

" 1. Sidewalk sheds required.  *  *  *

" (b) Regardless of the horizontal distance from the structure to sidewalk or temporary sidewalk, sidewalk sheds of adequate dimensions shall be erected when building materials are being moved over the sidewalk by means of derrick, hoist or chute. *  *  *

" (2) Design of sidewalk sheds.  *  *  *

" (b) Such sidewalk shed shall be capable of sustaining safely a minimum live load of one hundred fifty pounds per square foot, but if such sidewalk shed is used for overhead storage of material, it shall be capable of sustaining safely a minimum live load of three hundred pounds per square foot. The members of the sidewalk shed shall be so connected, and such adequate bracing shall be provided as may be necessary to resist the displacement of members or the distortion of the framework.  *  *  * "

There was proof to warrant the jury in finding that Tully, the superintendent of Habern, directed the storage of stone upon the top of this bridge. The ordinances call for two kinds of bridges: (1) a shed capable of supporting 150 pounds live weight to the square foot, which was the minimum strength of any bridge that might be constructed; and (2) a shed capable of supporting 300 pounds per square foot.

Concededly, the bridge involved here was erected to sustain only 150 pounds to the square foot. Tully called it a " nonloading " bridge and admitted that it would be improper to use it for the storage of materials. However, Habern argues that whether it was unsafe depended on whether it was overloaded, and this in turn depended on whether stone in excess of 150 pounds to the square foot was placed on it. This

defendant contends that as the evidence discloses that the stones deposited on June 22d and 23d were strung singly over the top of the bridge, the weight applied would not exceed 60 pounds to the square foot. It points out that each stone was 3 feet by 5 feet, and, therefore, took up 15 square feet in space. Accordingly, as they did not exceed 900 pounds in weight, the weight applied would not exceed 60 pounds to the square foot.

While there is considerable force to this argument of Habern, its own witness, Tully, testified at one point that stones were piled, at least temporarily, in tiers of three, which would bring the weight above 150 pounds to the square foot. However, the testimony of other witnesses for the plaintiff was to the effect that the stones, after being deposited in tiers of three, were taken off and distributed singly over the bridge. Hence, it might be that the whole testimony shows, as Habern claims, that at the time of the accident the weight resting on the bridge did not exceed the 150 pounds per square foot capacity. If this was so, there would be no overloading, and little, if any, proof that the bridge would be an unsafe place to work, if it had not been for the intervening fall of the draft. Thus the proof might well be insufficient to establish a violation of section 200 of the Labor Law.

But the evidence in this case would justify a finding that Tully directed the use of the sidewalk shed for overhead storage of material, which, of itself, would violate the last ordinance aforesaid (Administrative Code, § C26–557.0, subd. 2, par. [b]). Concededly, the bridge was not built to sustain a minimum load of 300 pounds per square foot. Whether such violation of this ordinance occurred, and constituted negligence, and was a proximate cause of the accident and the resulting injuries would be for the jury. If the case had been submitted to the jury solely on the basis of violation of the city ordinances aforesaid, we would be inclined to sustain the verdict in the plaintiff's favor against Habern. However, as previously noted, the trial court submitted to the jury the question of Habern's violation of such ordinances together with sections 240 and 241 of the State Labor Law, without distinguishing between these statutes.

This requires us to consider the applicability of sections 240 and 241 of the Labor Law, insofar as covered in the charge.

The portions of section 240 read to the jury were as follows:

" § 240. *Scaffolding and other devices for use of employees.*

" 1. A person employing or directing another to perform labor of any kind in the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure shall

furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed or directed. * * *

" 3. All scaffolding shall be so constructed as to bear four times the maximum weight required to be dependent therefrom or placed thereon when in use."

Section 241 of the Labor Law which was also read provides:

" § 241. *Protection of employees on building construction or demolition work including excavation work in connection therewith.*

" All contractors and owners, when constructing or demolishing buildings or doing any excavating in connection therewith, shall comply with the following requirements: * * *

" 6. The board of standards and appeals may make rules to provide for the protection of workmen in connection with the excavation work for the construction of buildings, the work of constructing or demolishing buildings and structures, and the guarding of dangerous machinery used in connection therewith, and the owners and contractors for such work shall comply therewith."

No proof as to violations of rules adopted under section 241 was offered or charged, and it is difficult to see how the section had any application.

There remains, then, the applicability of section 240 to Habern. The trial court took the view that the bridge was a scaffold within the statute. If this view was correct, then Habern might be liable for failure to furnish a proper scaffold, as it had erected the same. But section 240 refers also to hoists and ropes, and the court left to the jury the question of whether Habern had failed to supply and operate proper devices of such nature. Thus, the effect of the charge was to make Habern liable not only for any defect in the condition of the bridge, but of the crane as well, and for failure to furnish ropes and placed on it the burden of showing that said devices were properly operated. That the Trial Judge intended to so charge seems clear from a reading of the main charge, and it is emphasized by the refusal of Habern's requests to charge.

This was error as the crane and ropes were furnished and operated by subcontractors. It was expressly held in *Iacono* v. *Frank & Frank Contr. Co.* (259 N. Y. 377), that an owner,

which did none of the construction work, but maintained only a building superintendent on the job, was not liable by reason of the failure of a hoist operated by a subcontractor to properly perform its function. The Court of Appeals in discussing section 240 of the Labor Law said (p. 382): " Nor do we think that the Legislature, in using the phrase ' a person * * * directing another to perform labor,' had in mind an owner performing work through an independent contractor, or that it intended to impose liability upon such an owner for injuries arising from defective appliances supplied to his laborers by an independent contractor, as though the owner were a person ' directing ' such laborers. Therefore, we think that the statute has no application."

The more recent case of *Koenig* v. *Patrick Constr. Corp.* (298 N. Y. 313), where the statute was held applicable to an owner, is distinguishable because there the instrumentality involved was a ladder supplied by an owner to the workmen.

The crane here was supplied by United in the performance of its contract to put the stones in place. It was being used by United's employees, or United's employees assisted by the crane company's employees, depending upon whether the crane operator should be considered a United workman or in the employ of the crane company. Clearly, however, Habern was doing none of the work involving the use of the crane itself, and it had no liability for the condition or operation of the crane. Accordingly, it was error to permit the jury to find the defendant Habern liable under section 240 of the Labor Law for furnishing a defective crane.

It is likewise as to the ropes. There was some claim that the spinning of the draft was due to the failure to use ropes known as tag lines. Again the burden was on United in respect to furnishing proper ropes.

There is no evidence here that Habern knew of any defective condition of the choker, or the failure of the riggers to use a rope to stop spinning, or with respect to any overloading of the crane. This distinguishes the case from *Adler* v. *Tully & Di Napoli* (300 N. Y. 662), where actual knowledge of a defect in a crane and failure to stop its use was held to establish common-law negligence on the part of the general contractor.

We think, therefore, that the charge was too broad in submitting Habern's liability to the jury on the theory of violation of sections 240 and 241 of the Labor Law. This requires reversal and a new trial as to it.

*(2) As to Parker and Gitsman Doing Business*
*as A & P Crane Rental Co.*

The questions submitted to the jury with relation to the Crane Company were:

"Question No. 7. At the time of this accident were Stephen Bahill [operator] and Robert Bahill [oiler] employees of the A & P Crane Company?" The answer to this question was "Yes".

"Question No. 8. At the time of this accident were Stephen Bahill [operator] and Robert Bahill [oiler] employees of the United Stone Works, Inc.?" The answer to this question was in the negative.

"Question No. 9. Was the choker and cable as furnished by the United Stone Company a proper choker and cable, reasonably safe for the purpose for which they were used at the time of the accident?" The answer to this question was "Yes".

A general verdict was also rendered against the crane company.

This defendant claims not to be liable to the plaintiff because (a) the operator and oiler of the crane were, at least, *ad hoc* employees of United; (b) even if there was a question for the jury as to whether these men remained in the employ of the crane company, whatever negligence may have caused this accident, did not result from the operation of the crane, but from the breaking of the cable or choker supplied by United; and (c) if, as the jury apparently found, the defective condition of the choker was not the cause of the accident, then the only other negligent acts could have been overloading or the spinning of the load causing the choker to unravel, and the operator of the crane had nothing to do with either occurrence, as the loading as well as the use or nonuse of tag lines, which would have stopped spinning, were entirely within the control of United's employees, the riggers.

We agree with the crane company's contention that the operator and oiler became, at least, *ad hoc* employees of United. When these men arrived with the crane, a contract was then signed by Feinstein, the president of United, in which, among other things, he agreed to take over these employees and put them on his payroll. He did this, paid them their wages, and deducted social security and old age benefits from their pay. All directions given as to the operation of the crane were given by United's employees. So far as appears from the record, the crane company was not in the business of operating cranes,

but only renting them. Aside from the inference that might be drawn from their possession of the crane upon arrival, there is no proof that the crane company had ever employed the Bahills or that it had agreed to pay them for any services. The contract called for United to pay for the cost of transportation of the crane to the site. Further, there is no evidence that United was compelled to take these two workmen with the crane, and apparently did so as a matter of choice.

The Court of Appeals has had occasion to consider the application of the *ad hoc* principle in connection with rental of cranes in several recent cases (*Bartolomeo* v. *Bennett Contr. Co.*, 245 N. Y. 66; *Ramsey* v. *New York Central R. R. Co.*, 269 N. Y. 219; *Kristiansen* v. *Wagner's Steel Erectors, Inc.*, 295 N. Y. 668; *Burton* v. *American Bridge Co.*, 297 N. Y. 993). These cases, holding that it was a fact question as to whether the owner of the crane continued to be the master, are clearly distinguishable on their facts. It may be noted that in all of these cases the accident occurred through the negligent operation of the hoisting machine, and not by reason of a defect in a part supplied by the lessee nor because of negligence in overloading or the failure to use ropes, where the amount of the load and the use of ropes was under the control of the lessee. These cases are further distinguishable as to the circumstances affecting hiring in that there is no proof in the case at bar that either the operator or the oiler of the crane had ever worked for the crane company before, or was subject to discharge by it. The only proof of their connection with the crane company was the inference that might be drawn from their accompanying the crane to the site of the job. As noted, United assumed the cost of transportation of the crane.

But even if we deem that there was a question for the jury as to whether the crane operator and oiler were in the employ of the crane company after the arrival at the job site, their employment only related to the operation of the crane, such as the application of the power to lift and the raising and lowering of the load. United had on the job three riggers, including the deceased. The witnesses agreed that riggers are men whose job it is to supervise hoisting. The employees of United had entire control of fastening the stones to be lifted and selecting the places where the stones were to be deposited. They had control of the size of the draft. They arranged the straps around the draft and its fastening to the shackle as well as the fastening of the choker to the hook under the ball

on the crane. It was these employees who noticed that during the day the ball at the end of the boom occasionally struck a part of the building, and also noticed that there was not enough drift or sidewise motion of the load so that the drafts could be swung into the desired locations. It was these employees of United who determined to use a choker or additional length of cable for the purpose of supplying greater drift. While it is true that they called down to the operator of the crane that they were adding the choker, and he said " O.K.", this may as well have been to acknowledge notice of the extra length of cable as to show that the operator had any choice of whether a choker should be used or not. The whole of the proof would indicate he had no choice in the matter.

There is the further fact called to our attention by the plaintiff that the size of the load was visible to the operator, and he, therefore, had some control of the loading. We think, however, the evidence clearly discloses that at no time did the operator have control of the loading or in any wise attempt to direct or supervise the size or manner of securing the load. This, admittedly, was rigging work. The choker itself came from United's shop. The spinning of the load was said to be due to the absence of tag lines. There were ample tag lines on the job supplied by United, but the riggers, including the deceased, were the ones who decided not to use them. The decedent was attempting to stop the spinning by holding the draft by hand when the accident happened.

Accordingly, in our opinion the operator of the crane had nothing to do with either the use of the choker which broke, nor was he responsible for the spinning or weight of the load. Therefore, even if we were to assume that the jury was justified in finding (as it did) that the operator of the crane remained in the employ of the crane company, there would be no proof to show that there was any negligent act by the operator of the crane having any causal relation to the accident.

But we do not find sufficient evidence to support the finding of the jury that the operator of the crane was in the employ of the crane company at the time of the accident. We reversed that specific finding for that reason. We dismiss the complaint against the crane company because of lack of proof of any negligence on its part that contributed to the accident. With this disposition its cross claim falls.

### (3) *As to Causal Relation Between the Death and the Accident.*

This brings us to the causal relation between the accidental injury and the death from cancer. We see no necessity of passing on the sufficiency of the proof to support the verdict in this regard at this time. We might well hold that the finding of such causal relation was contrary to the weight of the evidence upon the present record. There was some opinion evidence, however, by a physician supporting plaintiff's claim. The proof on a new trial, however, may differ from that now before us. We, therefore, refrain from dismissing the complaint on the death action.

### (4) *As to the Cross Claims.*

This leaves only the question of the cross claims of Habern against United and the crane company. That against the crane company must be held properly dismissed because we have dismissed the plaintiff's complaint against the crane company.

As to the cross claim of Habern against United, we think it is preferable that its disposition await the second trial. The claim is sufficient upon the face thereof, and the question as to whether the right to indemnity would arise should be decided on the evidence adduced at the second trial rather than on the present record.

We, therefore, (1) affirm the judgment as to Monroe Lawrence and its cross claims, with costs; (2) reverse the judgment as against the crane company and dismiss the complaint as to it, with costs; (3) dismiss the crane company's appeal as to its cross complaint; and (4) reverse the judgment against appellant Habern Realty and the dismissal of its cross claim against United, and order a new trial as to same, with costs to abide the event. Settle order.

Van Voorhis, J. (dissenting in part). I concur in the dismissal of the complaint against Monroe Lawrence Construction Corporation and against Clarence Parker and James L. Gitsman, doing business under the name of A & P Crane Rental Co., but consider that the complaint ought also to be dismissed against Habern Realty Corporation. The sole, efficient producing cause of the accident was the breaking of the " choker " cable, for which Habern was not responsible, causing one and one half tons of stone to be dropped for three feet before striking the frame bridge over the sidewalk. The bridge was not supposed to withstand that kind of a shock, nor would it have made any difference if it had been constructed with the additional sup-

porting joists which would have qualified it for the storage of materials under the Administrative Code. The purpose of paragraph (b) of subdivision 2 of section C26–557.0 was not to avert this kind of a catastrophe. This bridge would have collapsed regardless of whether it had been loaded with stone, or, being loaded, if it had been constructed to carry a load of 300 pounds per square foot. The violation of the Administrative Code had no causal connection with the accident. The bridge did not fall because of storage of materials upon it in violation of the code; it was demolished when hit by a battering ram with a force approximating that of a pile driver.

It is not an answer to say that plaintiff's intestate was injured by the falling upon him of stone which had been stored upon the bridge, unless the jury could have found that the bridge would not have fallen if it had been constructed to support a weight of 300 pounds per square foot. The code allows the storage of stone on such a bridge. It is apparent that this bridge would have collapsed just as quickly if it had been built to support the 300 pounds per square foot of weight. There was no duty to build a structure strong enough to catch falling slabs of granite.

If it were argued that the record is without expert testimony that the planks and joists forming a 300 pound per square foot bridge of this character, piled with stone as the Administrative Code permitted, would have collapsed, it would be a sufficient answer that there is no testimony that such a bridge could possibly have withstood this tremendous force. The burden is upon plaintiff to prove that storing stone on the 150 pounds per square foot bridge as directed by Tully (manager of Habern), was a cause of the accident. The circumstance that a section of the Administrative Code was violated creates no presumption of a causal relationship between the violation and the accident. The test of whether a causal relation existed, is whether the result would have been different if the ordinance had been complied with — that is, if the conditions were the same except for a bridge built to support 300 pounds per square foot. Even if the inference, necessary to a recovery by plaintiff, were merely doubtful or uncertain that a bridge built to uphold 300 pounds per square foot, piled with stone, would have withstood the shock, then plaintiff would have failed to sustain the burden of proof on the subject of causation, and the complaint should be dismissed as in any case where an essential fact is established only by speculation.

How far the trial went awry is shown by the circumstance that the jury found that the " choker " wire cable, which dropped the stone from the crane, was reasonably safe for the purpose for which it was being used at the time of the accident. This accorded with the apparent object of the action, which was to circumvent the Workmen's Compensation Law. Plaintiff's intestate doubtless was entitled to draw workmen's compensation during the time while he lived and was incapacitated by the accident, and plaintiff would be entitled to recover a death benefit if it could be established that the accident caused him to die from cancer, but only by a strained construction of the facts can it be held that plaintiff has proved a common-law cause of action.

The judgment appealed from should be reversed and the complaint should be dismissed.

PECK, P. J., GLENNON and SHIENTAG, JJ., concur with CALLAHAN, J.; VAN VOORHIS, J., dissents in part, in opinion.

Judgment as to Monroe Lawrence Construction Corporation and its cross claims affirmed, with costs; judgment against the A & P Crane Rental Co. reversed and the complaint, as to it, dismissed, with costs; A & P Crane Rental Co's. appeal as to its cross complaint dismissed; judgment against appellant Habern Realty Corporation and the dismissal of its cross claim against United Stone Works, Inc., reversed, and a new trial ordered as to same, with costs to abide the event. Settle order on notice.