## ALTAMURA v. UNITED STATES et al.

District Court, S. D. New York.

Nov. 25, 1947.

Nathan Baker, of Hoboken, N. J., for libellant.

John F. X. McGohey, U. S. Atty., of New York City (Irving L. Evans, of New York City, of counsel), for respondents United States, War Shipping Administration, and Parry Navigation Co., Inc.

E. C. Sherwood, of New York City (Patrick J. McCann, of Brooklyn, N. Y., of counsel), for respondents Turner & Blanchard and John E. Johnson.

CONGER, District Judge.

Libellant sues to recover damages for personal injuries which occurred to him while he was working on the S.S. John H. Eaton.

The accident occurred on November 13, 1943 while the Eaton was docked at Pier 10, Hoboken, New Jersey.

The case was tried before me without a jury.

Libellant was a longshoreman employed by Turner & Blanchard, Inc., a stevedoring company, and at the time of the accident was engaged with other employees of his employer in loading the vessel.

Respondent, United States of America, was the owner of the vessel and respondent, Parry Navigation Company, Inc., was the

general agent under a general agency agreement between the War Shipping Administration and Parry Navigation Company, Inc.

Libellant takes the position that the question of the responsibility of the Parry Navigation Company, Inc. is not important in view of the fact that the United States of America has been sued as owner and libellant makes no argument as to whether the responsibility is that of the United States or Parry Navigation, or jointly.

Respondents in a joint answer to the libel denied liability and pleaded a number of separate defenses, and in addition impleaded Turner & Blanchard, Inc., and John E. Johnson, doing business as Seaboard Contracting Company, alleging that if there was any responsibility it was the responsibility of the inpleaded respondents.

At the conclusion of the trial of the issues, counsel for respondents stated to the court that no evidence would be offered against the respondents impleaded, whereupon on motion by the proctor for the impleaded respondents I dismissed the pleadings which brought them into the case and in so far as any pleadings referred to them.

The issue, therefore, now is between libellant and the original repondents.

The gist of libellant's cause of action is that on the date aforesaid, after he had finished his work in the hold of the vessel, he and the other members of his gang started to leave the vessel to go home; that as libellant was ascending the ladder which was at the aft end of No. 4 hatch, when he came to the top of the ladder, he was caused to slip and fall back into the hold, then and thereby and as a result thereof he was seriously injured.

The issue is one involving negligence. Libellant charges that his injuries were caused by the negligence of respondents, in that defective winches, being used on the vessel, caused oil and grease to leak therefrom and to go in and upon the deck, hatch coaming and ladder of the vessel; that respondents caused and permitted oil and grease to be placed, spilled or to remain upon the ladder so as to make it slippery, unsafe, and hazardous.

There are other charges of negligence alleged, but the above are the ones, which libellant at the trial attempted to prove or the ones, which under the proof he may expect to succeed.

It all gets down to this: Did respondents furnish libellant a reasonably safe place to work?

Respondents did have a duty to libellant.

Libellant, an employee of an independent contractor, doing work for the owner of the vessel, occupied the status of an invitee aboard the ship and as such he was entitled to a reasonably safe place to work. The duty to provide such a place devolved upon the owner of the vessel. For the breach of such a duty liability attaches. This duty persisted despite any concurrent duty on the part of libellant's employer. Fodera v. Booth American Shipping Corp., D. C., 66 F.Supp. 319, 1946 A.M.C. 1465, affirmed 2 Cir., 159 F.2d 795; Anderson v. Lorentzen, 2 Cir., 160 F.2d 173.

The first thing to inquire into is whether or not libellant has proven that there was oil or grease on the ladder when he was ascending it, and whether or not such oil or grease was the proximate cause of his fall and resulting injuries. There is no question but that libellant did fall from the ladder or the coaming around the hatch and did receive injuries.

The testimony from which I must render my opinion as to what the cause of libellant's fall is so hopelessly contradictory that it may not be reconciled.

Libellant testified that he was working in No. 4 hold loading steel; that about 5 P. M. it was time to quit and the men started to leave the vessel; that they went up the ladder which was at the aft end of No. 4 hatch; that when he got to the top of the ladder he put his hand on the top step and his hand slipped causing him to lose his balance and fall to the hold, a distance of about 35 feet; that he felt grease on the top rung of the ladder but did not see it; that the top of the ladder from which he fell was near two winches on the deck which were over about 2 feet away; that he saw oil or grease between the winches and the coaming of the hatch; that he saw oil there at noon when he went to lunch and when he came back at 1 o'clock from

lunch there was more oil there; that he was the last of the gang to go up the ladder.

He was corroborated by a fellow worker, DeCesare.

He testified that he had already gone up the ladder when he heard a watchman holler, "A man fell down." The witness was then interrogated about the presence of oil in the vicinity of the winches. His testimony was a bit confusing but it was to the effect that when he came out at 5 o'clock and got near the top of the rung he slipped a little bit. He said that there was a little bit of grease on top; that he slipped a little bit referring to the top rung of the ladder. He said that at 12 o'clock there was a little bit of oil on the deck; also a little on the hatch coaming. He said that when he got to the top of the ladder he had to hold on with his hands on the top of the coaming and that he slipped there a little bit. He later said that at 12 o'clock there was oil only on the deck and none on the hatch coaming; that at 1 o'clock when he went down there was oil on the deck and a little bit on the hatch coaming; that at 5 o'clock there was more oil than there had been at 12 or 1 o'clock, and later in answer to a question by the court:

"Q. Coming up at 5 o'clock, was there oil on the deck? A. Yes.

"Q. Much oil? A. Not much. Got more oil.

"Q. Was there oil on the hatch coaming? A. Yes.

"Q. Much oil? A. No.

"Q. On the coaming? A. Little bit. On deck got more oil."

At the outset this witness stated that he did not understand much English but the proctor for the libellant thought he would be able to get along without an interpreter. However, after the witness had been examined on direct examination and was being cross-examined it appeared that an interpreter would be of help. I, therefore, called an interpreter, and after that the witness was examined again about practically the same things.

He said that at 1 o'clock on the deck there was a little oil between two winches.

There wasn't much. Just a little bit. It was not slippery. There was a lot at 5 o'clock; that he saw the oil and went around it.

He stated that the oil on the deck was about ½" thick mixed with dirt; that it was all soaked with oil near the hatch; that when he came up at 5 o'clock he looked up the hatch and he sort of slipped and held on; that he slipped a little and held on with the other hand; that at 1 o'clock in going towards the ladder into the hold he walked between the two winches; that he put a small plank down; that there was a little bit of oil there; that at 1 o'clock the coaming was wet but the ladder was not wet but right near the entrance it was wet; that on the top of the inside of the hatch coaming it was sort of greasy at 1 o'clock. It was hard to say with any exactness from the testimony of this witness just how much oil was there except that the general purport of his testimony was that in coming up out of the hold at 5 o'clock he slipped either on the top rung of the ladder or while he was on the top rung of the ladder his hands slipped on the top of the coaming. At least he testified there was oil in and about the vicinity of the winches and the entrance to the hold and that there was some on the hatch coaming.

Then there was witness Peter Vanderberg who was said to be the winch operator. He testified that the winches had been leaking oil; that there was considerable oil between the winches and the coaming; that the winches were throwing oil so that he had to put up a cardboard to prevent the oil from striking him.

He remembered that in 1943 while he was working as a winchman on a vessel at the pier in question he was told the next morning that a man had fallen down the hold the afternoon before; that he did not see the accident; that he did not know the man's name; neither did he remember the month or the day when this accident occurred and he did not remember the name of the ship. He then proceeded to testify about the oil stated as above.

At first I was under the impression that the man was not on the ship on that day, but it seems very likely that he was.

He also stated that when the accident had happened he had been working on the ship 4 days. It is undisputed that this could not have been so; that the ship commenced loading on the morning of November 12th, and the accident happened on the 13th. He also stated, "We had to put boards on the floor to stand on it because there was so much oil you could not stand on your feet."

On the other hand, respondents produced a number of witnesses who testified as to the winches, and the condition of the deck, hatch coaming, the ladder, and the deck near the winches and the hatch coaming.

The witness Circulnick, at that time night security officer or night mate of the vessel (at the time of the trial not in the employ of respondents), testified that he was just coming on duty; that he observed that a number of men were standing around No. 4 hold peering into the hold; that he saw a man lying on top of the steel in the hatch; that he inquired as to how the accident had happened; that he later made an entry into the log book; that at the time he went over to the hold to look down; that he saw no oil on the deck at No. 4 hatch between the winches or on the hatch coaming or the ladder.

The witness Aanes at the time of the accident was a guard on the ship (in the employ of a "guarding company"), and was not far from the place of the accident. At the time of the trial he was a merchandise broker.

He testified that he remembered the accident; that he was the man who called out that a man had fallen into No. 4 hold; that men were knocking off for supper; that men were coming up the ladder out of the hold, and most of them were up, when suddenly he saw a man on the hatch coaming, and, to quote his exact language, "it looks to me like he doubled over and went down the hatch, and I went over to look and sure there he was down on the bottom"; that he [libellant] had his feet on the hatch coaming [a direct contradiction of libellant's story]; that while he did not look particularly for oil or grease he did not notice any around the winches or any on the hatch coaming.

The witness Suarez was a junior engineer of the vessel at the time of the accident. At the time of the trial he was no longer employed by respondents, but was a salesman in a furniture store. He testified that on the day of the accident he came aboard about 6 P.M.; that he was told of the accident to libellant.

The testimony of this witness was not too clear or definite, but he did say that the deck was clean and there was no oil or grease on it.

Witness Hudson had charge, for Turner & Blanchard, of the stevedores working on the ship. He testified that at the time of the accident that it was his job to be all over the ship, on the deck and in the hold; that on the day of the accident he was up and down into No. 4 hold at least twice, once in the morning and once in the afternoon; that he saw no oil in the coaming or the ladder; on the deck by the winches a little oil "a drop or two that is spilled from the oiler or engineer coming around and swabbing the pistons."

Witness DiBernardi, employed by Turner & Blanchard, called as a witness for libellant for another purpose, on cross-examination testified that he was hatch foreman on the vessel that was being loaded; that his job was to go down the hold and to be on the dock to tell the men what to do; that he would go up and down hold No. 4 ten to twelve times a day; that on the morning of the accident he saw no oil or grease on the hatch coaming or the ladder; that he saw none in the afternoon; that he saw no oil or grease on the deck around the winches; that he was on the dock when he heard some one holler that Altamura had fallen; that he ran to the ship and saw Altamura in the hold; that during the day none of the winch operators had complained to him about oil on the deck; that he did not see the winches spitting oil the day of the accident; that at about 4:15 P.M. he went between the winches and saw no oil there; that he saw no dunnage. This witness did not notice the conditions after 4:15.

P.M. or at the time of the accident (4:50 P.M.).

Captain Cartwright, a witness for respondents was an interesting witness. He testified that he had been to sea since he was 12 years of age. After he had been at sea for 49 years he retired; that he had been a master for 20 years; that during World War II he had volunteered his services to the Government; that he had become Chief Officer of the Eaton; that he had been on another vessel and then was sent to the Eaton. He arrived on board the Eaton on November 12, 1943; that from then on he made frequent inspection of the ship, went up and down the holds; that he was in charge of the ship; that the accident to libellant was reported to him and that he saw libellant being carried off the ship; that he went to hatch No. 4, and saw no oil around there; that the presence of oil was not reported to him; that he looked around the deck, between the winches and at the hatch coaming and saw no oil. He even went down the ladder into the hold. He testified:

"Q. You went down the same ladder? A. Yes, sir.

"Q. Was there any oil? A. No, sir."

There was testimony on the part of respondents which I accept as true; that the Eaton was a practically new liberty ship, having been completed on February 28, 1943; that the vessel had made 3 voyages prior to the date of the accident.

There was testimony given by the Port Captain of respondents that he inspected the ship when it arrived in Hoboken and found its various parts including the winches in proper condition for loading the vessel.

There was much testimony on the part of libellant as to the winches and the manner of oiling and greasing them. The general purport of the testimony was that the winches were new and modern; the latest type of steam winches put out; that no repairs had been made to the winches since they had been installed on the ship. All of this testimony tended to prove that it was highly improbably that grease or oil to any extent dropped to the deck of the vessel from the winches and certainly not to the extent claimed by libellant and his witnesses.

As I stated before, the testimony on the question of negligence, i. e., the defective winches and the oil and grease on the deck, the coaming and the ladder, is so contradictory that it may not be reconciled. After a careful perusal of the testimony I have come to the conclusion that I should accept in the main the testimony in this respect offered by the witnesses for the respondents. There are many reasons for so doing. This was practically a new ship; the winch in question was new and of the latest design. Respondents' testimony about the winch rather convinces me that it was not spilling oil or leaking oil.

I was much impressed by the testimony of Captain Cartwright. Had there been oil on the deck in the vicinity of the winches and on the coaming of the hatches as well as on the ladder, certainly some one of the ship's officers or the stevedore bosses would have known of it, or had their attention called to it. The proof is that none of these men had their attention called or directed to the presence of oil.

After libellant had fallen, if there was oil near the hatch, some one would have mentioned the fact. Certainly if the winch had been spitting oil all day and if there was oil around the winches and in the vicinity of the winch in the quantity as testified to by the witness Vanderberg, the two stevedore bosses, Hudson and DiBernardi would have noticed it. While it was no part of their duty to clean off the deck, still for the safety of the men working under them, which included libellant, one would expect they would have taken steps to have some one remedy a dangerous situation.

It should be remembered also that Aanes the night security officer and the only eye witness to the accident testified that libellant fell from the top of the hatch and not from the ladder.

■ A careful resume of the whole case convinces me that while libellant fell while coming out of the hold, his fall was not caused by any oil or grease on the ladder or on the hatch coaming; that the winch was not defective; that it did not

cause oil or grease to leak therefrom and to go upon the deck and ladder of the ship; that respondents did not fail to furnish libellant a safe place to work; that libellant's fall was not caused by any negligence or lack of care on the part of respondents, its agents and servants.

Respondents are entitled to judgment.

Libel dismissed.

Settle judgment on notice.