CHARLES McFALL, Respondent, *v.* COMPAGNIE MARITIME BELGE (LLOYD ROYAL) S. A. et al., Appellants, et al., Defendants.

COMPAGNIE MARITIME BELGE (LLOYD ROYAL) S. A., Defendant and Third-Party Plaintiff-Appellant, et al., Defendants and Third-Party Plaintiffs, *v.* BUNGE CORPORATION, Third-Party Defendant-Respondent.

BUNGE CORPORATION, Third-Party Defendant and Third-Party Plaintiff, *v.* Dow CHEMICAL COMPANY, Third-Party Defendant.

Dow CHEMICAL COMPANY, Third-Party Plaintiff-Appellant, *v.* TRANSOCEANIC TERMINAL CORPORATION, Third-Party Defendant-Respondent.

COMPAGNIE MARITIME BELGE (LLOYD ROYAL) S. A., Defendant and Third-Party Plaintiff-Appellant, et al., Defendants and Third-Party Plaintiffs, *v.* TRANSOCEANIC TERMINAL CORPORATION, Third-Party Defendant-Respondent.

COMPAGNIE MARITIME BELGE (LLOYD ROYAL) S. A., Defendant and Third-Party Plaintiff-Appellant, et al., Defendants and Third-Party Plaintiffs, *v.* Dow CHEMICAL COMPANY, Third-Party Defendant-Respondent.

Argued March 11, 1952; decided July 15, 1952.

*Barent Ten Eyck* for Compagnie Maritime Belge (Lloyd Royal) S. A., defendant-appellant and third-party plaintiff-appellant. I. Plaintiff's verdict against Compagnie was contrary to the evidence, because Compagnie was not itself actively negligent and no finding of active negligence on the part of Dow or Transoceanic (supportable in the evidence) was imputable to Compagnie. (*Palsgraf* v. *Long Island R. R. Co.,* 248 N. Y. 339; *Van Leet* v. *Kilmer,* 252 N. Y. 454; *Riley* v. *Agwilines, Inc.,* 296 N. Y. 402.) II. If plaintiff's recovery against Compagnie was supportable in the evidence it was only because active negligence on the part of Dow or Transoceanic, or both, supportable in the evidence, was found to be imputable to Compagnie, Compagnie itself being only passively negligent; and, consequently, Compagnie is entitled to recover over against one or both of those third-party defendants, depending upon the supportability in the evidence of a finding that active negligence on the part of either or both of them proximately caused plaintiff's injury. (*Bank Line* v. *Porter,* 25 F. 2d 843; Civ. Prac. Act, § 109, subds. 5, 8; *People ex rel. Durham Realty Corp.* v. *Cantor,* 234 N. Y. 507; *Livingston* v. *Livingston,* 246 N. Y. 234; *Drucker* v. *693 Saratoga Ave. Corp.,* 245 App. Div. 760; *Kanzer* v. *Heffron,* 235 App. Div. 646.)

*George J. Conway* and *George A. Garvey* for Dow Chemical Company, defendant-appellant and third-party plaintiff-appellant. I. The verdict for plaintiff against Dow Chemical is contrary to all the evidence in the case. The evidence shows that the cause of the broken drums was the rough handling by the Transoceanic stevedores. In the event judgment against Dow is sustained, Dow should have judgment over against Transoceanic. (*Niehoff-Schultze Grocer Co.* v. *Gross,* 205 App. Div. 67, 237 N. Y. 509; *Francis* v. *Gaffey,* 211 N. Y. 47; *Persick* v. *Philadelphia & Reading Coal & Iron Co.,* 182 App. Div. 291; *Hruska* v. *Stewart & Co.,* 272 App. Div. 910, 297 N. Y. 829; *Tipaldi* v. *Riverside Memorial Chapel,* 273 App. Div. 414, 298 N. Y. 686.) II. The order of the Appellate Division in reversing and dismissing the third-party complaint of the Belgian Line against Dow was correct. (*Fodera* v. *Booth Amer. Shipping Corp.,* 66 F. Supp. 319; *Globe S. S. Co.* v. *Moss,* 245 F. 54; *Hoff* v. *Pacific Amer. Fisheries,* 291 F. 306; *Tidewater Oil Co.*

v. *American S. S. Owners Mut. Protection & Ind. Assn.*, 156 Misc. 367; *Seas Shipping Co.* v. *Sieracki*, 328 U. S. 85; *International Stevedoring Co.* v. *Haverty*, 272 U. S. 50; *The Dondo*, 287 F. 239; *Schnell* v. *The Vallescura*, 293 U. S. 296; *The Exemilia*, 1941 A. M. C. 1684; *The Idefjord*, 1940 A. M. C. 1280.)

*Paul O'Dwyer* and *Joan O'Dwyer* for plaintiff-respondent. I. Dow was negligent. (*Rosebrock* v. *General Elec. Co.*, 236 N. Y. 227.) II. The shipowner was negligent. (*Schnell* v. *The Vallescura*, 293 U. S. 296; *The Nichiyo Maru*, 89 F. 2d 539; *Bank Line* v. *Porter*, 25 F. 2d 843; *Kaufer Co.* v. *Luckenbach S. S. Co.*, 294 F. 978; *Olsen* v. *United States Shipping Co.*, 213 F. 18; *The Isla de Panay*, 292 F. 723; *Fiorita & Amorso* v. *Cunard S. S. Co.*, 10 F. 2d 244; *Fodera* v. *Booth Amer. Shipping Corp.*, 66 F. Supp. 319; *Wilbur* v. *Williams S. S. Co.*, 9 F. 2d 940, 9 F. 2d 622, 271 U. S. 666; *Sciolaro* v. *Asch*, 198 N. Y. 77; *Liverani* v. *Clark & Son*, 231 N. Y. 178; *Aurigemma* v. *Nippon Yusen Kaisha Co.*, 238 N. Y. 183; *McCabe* v. *Turner & Blanchard*, 197 App. Div. 859; *Anderson* v. *Lorentzen*, 160 F. 2d 173.)

*Patrick E. Gibbons* and *Patrick J. McCann* for Transoceanic Terminal Corporation, third-party defendant-respondent. I. The third-party complaint was properly dismissed. (*Olsen* v. *United States Shipping Co.*, 213 F. 18; *The Isla de Panay*, 292 F. 723; *Fiorita & Amoroso* v. *Cunard S. S. Co.*, 10 F. 2d 244; *Kaufer Co.* v. *Luckenbach S. S. Co.*, 294 F. 978; *Liverani* v. *Clark & Son*, 231 N. Y. 178; *McCabe* v. *Turner & Blanchard*, 197 App. Div. 859; *The Pacific*, 23 F. 2d 218; *Aurigemma* v. *Nippon Yusen Kaisha Co.*, 238 N. Y. 183; *The Ensley City*, 71 F. Supp. 444; *Williams S. S. Co.* v. *Wilbur*, 9 F. 2d 622; *Bank Line* v. *Porter*, 25 F. 2d 843; *The Nichiyo Maru*, 89 F. 2d 539; *Schnell* v. *The Vallescura*, 293 U. S. 296.) II. There is no proof that the stevedores damaged the drums when loading them into the deep tank. (*Dougherty* v. *Milliken*, 163 N. Y. 527; *Schutz* v. *Union Ry.*, 181 N. Y. 33; *Blind* v. *Rochester Aeronautical Corp.*, 273 App. Div. 1056; *Aubry* v. *Ashland Realty Co.*, 255 App. Div. 205; *The Thomas P. Beal*, 11 F. 2d 49.)

CONWAY, J. Plaintiff, Charles McFall, a longshoreman in the employ of Transoceanic Terminal Corporation, commenced this suit to recover damages for injuries sustained when he was

overcome by carbon tetrachloride fumes while working aboard the cargo vessel S.S. *Stavelot*. The action was brought against the Compagnie Maritime Belge, as bareboat charterer of the vessel, hereinafter referred to as Belgian Line; Atlantic Overseas Corporation, Belgian Line's New York booking agent, hereinafter referred to as Atlantic; Dow Chemical Company, the manufacturer and shipper of the carbon tetrachloride, hereinafter referred to as Dow; and Bunge Corporation, the purchaser of the carbon tetrachloride, hereinafter referred to as Bunge.

The respective defendants in the primary action sought indemnity by commencing third-party actions.

Belgian Line and Atlantic commenced such actions against Dow, Bunge and Transoceanic.

Bunge commenced suit against Dow and Transoceanic.

Dow, in turn, served a third-party complaint upon Transoceanic.

Two questions are raised on this appeal: First, whether there is evidence in the record sufficient to justify the verdict in plaintiff's favor against Belgian Line and Dow, and second, whether recovery should be allowed to (1) Belgian Line against Dow and Transoceanic and (2) Dow against Transoceanic on their claims for indemnity. The trial court dismissed Dow's claim and the jury returned a verdict in favor of Belgian Line on its claims. The Appellate Division affirmed the dismissal of Dow's claim but reversed the judgment in favor of Belgian Line on the ground that " [a] ll of the parties referred to were joint tort-feasors and there is no basis in fact or in law for recovery over by one of the joint tort-feasors against any of the others ". (278 App. Div. 652.) Bunge and Atlantic are no longer involved in the action.

The carbon tetrachloride in question was manufactured and put into steel drums by Dow. Early in August of 1947, Bunge ordered from Dow 110 drums of that substance for export to Belgium, and booked space for them on the S.S. *Stavelot* through Atlantic. They were then transported from Dow's Texas plant to New Jersey by freight car and forwarded by lighter to Pier 37 on the North River, New York City, where the S.S. *Stavelot* was berthed. The drums arrived at that pier on August 27th and were checked by an employee of Trans-

oceanic on behalf of Belgian Line. They had the usual dents and bruises but were otherwise in good condition and a " clean " dock receipt was issued. On August 30, 1947, a pier superintendent in the employ of Transoceanic decided that the drums should be stowed in the deep tanks of No. 1 hold. The deep tanks are located in the lowest part of the ship on the port and starboard sides and are generally used for " wet cargo " or water ballast. The two openings into the port and starboard deep tanks are each seven feet, three inches wide and eleven feet, one inch long. The tanks are eighteen feet deep and are watertight. The only ventilation is that received through two air ducts at the top of the tanks.

Plaintiff and his fellow longshoremen then loaded the drums. The first two or possibly three drafts were loaded aboard the vessel in cargo nets whose ends were caught up by a cargo hook. When drums are loaded in that manner they are caused to be jammed together. After two or three drafts had been loaded thus, the longshoremen decided to use " pie plates ", which are seven feet wide round wooden platforms, as a means of loading the remaining drums. Five drums were placed upright on a pie plate and the draft was then swung aboard the vessel in a rope net. Seventy-two tons of lubricating oil, in drums, were loaded on top of the drums of carbon tetrachloride, on dunnage. The hatch was then covered. The Labor Day weekend followed and on September 2d plaintiff and his gang removed the cover from the hatch and plaintiff descended into the deep tank where he was overcome by carbon tetrachloride fumes. Police and fire emergency squads were summoned, mechanical ventilators were installed and, on September 3d, the longshoremen removed the cargo from the vessel. It was then discovered that 43 of the 110 drums were leaking at the " chime seals " or rims. There were no leaks in the bodies of the drums.

Plaintiff's claim against Dow is that it was negligent in shipping the carbon tetrachloride in inadequate, defective and unsafe containers.

Plaintiff rightly asserts, and Dow recognizes, that, in shipping for export carbon tetrachloride whose fumes are imminently dangerous to human life, Dow should have used containers reasonably suited to withstand handling by seamen or longshoremen as well as containers suited to withstand gas pressure

which could be expected to build up within the drums. It is Dow's contention that the drums involved were adequate and that the leakage is attributable to careless handling by the longshoremen.

As previously stated all of the leaks developed at the chimes, admittedly the weakest point of the drums. They were slow, barely discernible leaks. Neither the presence of dents in the sides of a number of the drums that were removed from the hold, as testified to by Dow's metallurgist, nor the stowing of drums of lubricating oil on top of the drums of carbon tetrachloride explains, of itself, the fact that 43 out of 110 drums developed slow leaks at the weakest part of the drums. It seems to us that the jury could reasonably infer, from that evidence, that the drums in question were inadequate for the purpose intended.

Dow points to the fact that the drums were made of new galvanized, 18 gauge steel and were constructed in accordance with the rigid requirements of Interstate Commerce Specification 17-E. It will be seen that that is a matter of defense and does not alter the fact that the evidence above mentioned makes out a prima facie case. It is not within our province to determine where the weight of the evidence lies. The evidence that a " clean " dock receipt was given by the Belgian Line when the drums were unloaded from the lighter to the pier is likewise a matter of defense. In any event a clean receipt is merely prima facie evidence that the drums were in apparent good order when received on the pier (see, e.g., *The Dondo,* 287 F. 239). There is evidence in the record from which it was possible for the jury to draw the inference that gas pressure developed inside of the 43 leaking drums (as a result of the hot weather over the Labor Day weekend) causing tiny cracks at their crimped seams. Consequently, the fact that the drums were in apparent, or even actual, good order when received does not preclude a finding that they were inadequate for their intended purpose.

Of course, it is true, as Dow argues, that there is evidence from which a jury could infer that rough handling caused the drums to leak. Transoceanic handled all the operations on the dock as well as the stowage and as already mentioned the first two or three drafts of drums were loaded into the vessel by

means of cargo nets as a result of which the drums were caused to be jammed together at the bottom of the net. Manifestly if that manner of loading caused damage to the drums it would only account for 15 or less of the 110 drums. Still, there is other evidence which would warrant the jury finding that the longshoremen failed to take such precautions as were necessary to prevent the drums from banging together as they were lowered into the tanks, as a result of which damage was caused to a greater number of drums. Moreover, when the testimony of Dow's metallurgist to the effect that three out of four drums, which were representative of all, contained sizeable dents, is read in conjunction with the evidence that the drums had the usual minor dents and bruises but were otherwise in good condition when received on the pier, it cannot be urged, seriously, that it was not possible for the jury to draw the inference that the drums were handled in a rough manner and that such handling helped to cause the 43 drums to leak. Nevertheless, the jury was not bound to conclude that rough handling was the sole cause of the leaking but was free to find that it was the concurrent negligence of Dow, in supplying inadequate drums, and Transoceanic, in handling them in a rough manner, which caused them to leak.

Plaintiff's claim that Dow was further negligent in not giving proper or adequate warning of the risks or dangers involved in the handling or stowing of carbon tetrachloride is not before us inasmuch as the complaint rests solely on the inadequacy and defective nature of the containers and the failure of Dow to warn of the " inadequate, defective, unsafe and dangerous condition of such containers or drums ".

Turning to the case against Belgian Line:

Plaintiff does not assert that the vessel was unseaworthy. Hence, the doctrine of *Seas Shipping Co.* v. *Sieracki* (328 U. S. 85, 94–95) has no relevancy here. The claim made is that Belgian Line failed in its duty to exercise due care to provide plaintiff with a reasonably safe place to work.

In *Riley* v. *Agwilines, Inc.* (296 N. Y. 402, 405–406) we said: " Since it is beyond the power of the State by legislation or judicial decision to mold or modify the maritime law (*Knickerbocker Ice Co.* v. *Stewart*, 253 U. S. 149), we must look to the decisions of the Federal courts to define the liabilities of ship-

owners for maritime torts, leaving out of consideration decisions of our own courts or statutes of the State which conflict with the rules of liability established in the Federal courts (*Robins Dry Dock & Repair Co.* v. *Dahl,* 266 U. S. 449, overruling *Maleeny* v. *Standard Shipbuilding Corp.,* 237 N. Y. 250.) * * * ' Notwithstanding the State court has concurrent jurisdiction with the Federal courts to entertain the suit (*Messel* v. *Foundation Co., supra* [274 U. S. 427]; *Kellogg & Sons, Inc.,* v. *Hicks,* 285 U. S. 502, 514) and the action is brought in the State court, the principles and rules of the substantive maritime law are alone to be applied as ground, if any, for recovery.' "

Under the maritime law a longshoreman who is employed by an independent contractor engaged by the owner to load its ship, occupies the status of an invitee aboard the vessel. As such he is entitled to a reasonably safe place to work. The duty of exercising reasonable diligence to provide such a place and warn the longshoremen of hidden dangers devolves upon the owner of the ship. For a breach of that duty liability follows. (*Fodera* v. *Booth Amer. Shipping Corp.,* 66 F. Supp. 319, 320, affd. 159 F. 2d 795; *The S.S. Anderson,* 37 F. Supp. 695; *The Dalhem,* 41 F. Supp. 718, 720; *Altamura* v. *United States,* 78 F. Supp. 531, 532.)

That duty is nondelegable and the fact that there is a concurrent duty imposed upon the longshoreman's employer to furnish him with a safe place to work does not alter the owner's liability. (*Anderson* v. *Lorentzen,* 160 F. 2d 173; *Vanderlinden* v. *Lorentzen,* 139 F. 2d 995; *Fodera* v. *Booth Amer. Shipping Corp.,* 66 F. Supp. 319, affd. 159 F. 2d 795, *supra; Porello* v. *United States,* 153 F. 2d 605, 608, revd. in part and affd. in part *sub nom. American Stevedores* v. *Porello,* 330 U. S. 446.)

Belgian Line concedes that it owed plaintiff such a duty.

Belgian Line also recognizes that the shipowner is charged with whatever knowledge it would have acquired as to the nature and characteristics of cargo carried on its ship had it exercised due care to acquaint itself with the facts (*Anderson* v. *Lorentzen,* 160 F. 2d 173, 175, *supra; Williams S.S. Co.* v. *Wilbur,* 9 F. 2d 622) and that there is imposed upon the master of a vessel a duty of seeing that cargo is stowed appropriately (*The Etna,* 43 F. Supp. 303, 305; *Carter* v. *Brown,* 212 F. 393).

Thus, in this case, the Belgian Line was chargeable with the knowledge that carbon tetrachloride fumes are heavier than air, tend to settle at the bottom of any confined space and have a numbing and serious effect on the human system when inhaled.

The initial question for our consideration, then, is whether or not a jury could reasonably find that the decision to stow the drums in the deep tanks was, in and of itself, a negligent act causally related to plaintiff's injuries.

United States Coast Guard regulations do not impose any restrictions with respect to the parts of a ship in which carbon tetrachloride may be stowed. Interstate Commerce regulations do not treat carbon tetrachloride as a dangerous article. The only testimony which tends to show that the mere act of stowing carbon tetrachloride in deep tanks was dangerous came from an inspector of the New York Board of Underwriters who testified that carbon tetrachloride should be stowed in a well-ventilated compartment which, obviously, a deep tank is not. However, that statement loses much of its impact when read in context. It is clear that in the opinion of the inspector the prime consideration was that carbon tetrachloride be stowed away from food and living quarters. The only warning which the drums themselves contained was that found on a blue sticker attached to each of the drums which read: " Warning, volatile solvent. Use with adequate ventilation ". A shipowner is not compelled to presume, at the time it stows drums containing liquids, that such drums are inadequate for the purpose intended. In the absence of such a presumption the label above quoted affords a warning only as to *users* and *use*.

Manifestly, if the drums in question had not been inadequate for the purpose or, if adequate, had not been handled in such a manner as to cause them to leak, the accident here would not have occurred even though the drums were stowed in the vessel's deep tanks. It was the leaking of the drums which rendered the deep tanks unsafe and which was the proximate cause of plaintiff's injuries. " One who seeks redress at law does not make out a cause of action by showing without more that there has been damage to his person. If the harm was not willful, he must show that the act as to him had possibilities of danger so many and apparent as to entitle him to be protected against the doing of it though the harm was unintended." (*Palsgraf*

v. *Long Island R. R. Co.*, 248 N. Y. 339, 345.) There has been no showing that the mere act of stowing carbon tetrachloride in the deep tanks had possibilities of danger '' so many and apparent '' that plaintiff was entitled '' to be protected against the doing of it ''.

However, plaintiff further claims that the drums were leaking when Belgian Line stowed them. Certainly, on the basis of the evidence adduced as to the properties of carbon tetrachloride, if leaking drums were loaded into the deep tanks by Belgian Line with knowledge of the fact that they were leaking, that would be a negligent act having possibilities of '' danger so many and apparent as to entitle him [plaintiff] to be protected against the doing of it ''. The sole testimony tending to establish that any of the drums were leaking at the time they were loaded aboard the ship came from a longshoreman. He testified that he noticed several drums leaking at the rims as they were being put aboard the ship and that he remarked about the fact to a man passing by whose name and position he did not know but who '' had a sort of an officer's cap on '' and whom he had seen '' [w]ell, sort of taking care of the crew members on his ship.'' Later, on cross-examination, he stated that he was unable to swear that there was more than *one* drum leaking. He also admitted that he did not know whether that drum contained carbon tetrachloride or lubricating oil. The testimony of that longshoreman is extremely weak evidence of the fact that he spoke to an authorized agent of Belgian Line or that any of the drums containing carbon tetrachloride was leaking when loaded into the vessel. Furthermore, other evidence tends to weaken his credibility. Although it was his job to report leaking drums of wet cargo to his hatch foreman he did not do so here. A checker employed by Transoceanic testified that it was he who checked the 110 drums as they were loaded into the vessel and he found no leaking drums. While it is true that the credibility of a witness and the weight of the evidence is for the jury, it is clear that the verdict here, when viewed in light of the Trial Judge's charge, shows beyond all question that the jury rejected the longshoreman's testimony, thereby concluding that Belgian Line did not have notice that the drums were leaking. The Trial Judge made it clear that, if the Belgian Line were found to have stowed the drums below

decks " knowing of their defective condition ", Belgian Line would be a joint tort-feasor and could not recover from any other tort-feasor. The jury brought in a verdict for Belgian Line against Dow and Transoceanic. Implicit in that verdict is the finding that Belgian Line stowed the drums without knowing that any of them was leaking.

Though the jury rejected the testimony given by that longshoreman it was still possible for them to find Belgian Line negligent. The Judge charged that such a finding could be made if Belgian Line failed " to warn these stevedores working about cargo of danger therefrom, if any, even though the stevedores' employer, as an independent contractor, may have been aware of the danger." Belgian Line did not warn the longshoremen of the properties of carbon tetrachloride nor did it caution them to employ special care in the manner of loading or handling that substance. As mentioned earlier, the evidence tended to establish that the longshoremen, in fact, handled the drums in a rough fashion and that such handling helped to cause the drums to leak. While it cannot be stated with absolute certainty that a warning by the shipowner would have prevented such handling and the consequent leaks, still it is probable that the warning would have had its effect and since it was the duty of the shipowner to warn against that happening the jury could properly find that such failure played an important role in this accident. Hence, the verdict against Belgian Line was justified.

The remaining questions relate to the claims by Dow against Transoceanic and of Belgian Line against Dow and Transoceanic.

It is essential to note that neither Dow nor Belgian Line is claiming contribution — both are seeking indemnity — and there is a fundamental distinction between contribution and indemnity. The right to contribution is not founded on nor does it arise from contract and only ratable or proportional reimbursement is sought in an action for contribution. In the absence of statutory provision one of several wrongdoers, who has been compelled to pay damages for the wrong committed, cannot obtain contribution from the others who participated in the commission of the wrong. Such is the rule recognized not only by the courts of this State (see, e.g., *Fox* v. *Western New York Motor Lines*, 257 N. Y. 305) but by the Federal courts (see

*Union Stock Yards Co.* v. *Chicago, B. & Q. R. Co.*, 196 U. S. 217, 224). The maritime rule has been stated as follows: "Where two vessels collide due to the fault of both, it is established admiralty doctrine that the mutual wrongdoers shall share equally the damages sustained by each, as well as personal injury and property damage inflicted on innocent third parties. This maritime rule is of ancient origin and has been applied in many cases, but this Court has never expressly applied it to non-collision cases." (*Halcyon Lines* v. *Haenn Ship Corp.* [1952], 342 U. S. 282, 284.) The Supreme Court then went on to declare the collision rule of contribution inapplicable in noncollision cases.

The common-law rule denying contribution to joint tortfeasors has been partially abrogated in this State by the enactment of section 211-a of the Civil Practice Act which authorizes contribution if two conditions exist: (1) a joint money judgment against the tort-feasors, and (2) the payment by one tort-feasor of more than his prorata share thereof. (*Fox* v. *Western New York Motor Lines*, 257 N. Y. 305, *supra*.)

The right to indemnity, as distinguished from contribution, is not dependent upon the legislative will. It springs from a contract, express or implied, and full, not partial, reimbursement is sought. Where several tort-feasors are involved an implied contract of indemnity arises in favor of the wrongdoer who has been guilty of passive negligence, if there be such, against the one who has been actively negligent. The actively negligent tort-feasor is considered the primary or principal wrongdoer and is held responsible for his negligent act not only to the person directly injured thereby, but also to any other person indirectly harmed by being cast in damages by operation of law for the wrongful act. Whether negligence is passive or active is, generally speaking, a question of fact for the jury.

Dow's claim against Transoceanic was dismissed at the close of the case by the Trial Judge in the following words: "Implicit in the fastening of liability on Dow must be a finding that the drums here involved were not reasonably safe for the purposes for which they were used and that Dow was affirmatively negligent. If this be so, then subsequent mishandling by Trans-

oceanic, if any there was, would establish both as active joint tortfeasors. In such circumstances, there may not be a recovery over.''

We agree with that disposition of Dow's claim against Transoceanic. The only evidence in the record which would permit a jury to find Dow negligent was that indicating that the carbon tetrachloride was shipped in drums which were inadequate for the purpose intended and the jury so found. That act was not a mere failure to perform a nondelegable duty imposed by law which, under the circumstances should have been performed by another — it was an act of affirmative negligence.

With respect to Belgian Line's claims for indemnity, the Trial Judge charged the jury that before the shipowner might recover from any third party the jury must be satisfied, not only that the third-party defendant was '' negligent in accordance with '' the charge, but also that the third-party plaintiff (Belgian Line) '' did not by any affirmative act of [negligence] * * * of its own contribute to the happening of this accident.'' Therefore, implicit in the jury's verdict for Belgian Line against Dow and Transoceanic is the finding that the Belgian Line was only passively negligent whereas Dow and Transoceanic were actively negligent. Since there is evidence sufficient to support that verdict it must stand.

Transoceanic was negligent in failing to warn the longshoremen of the properties of carbon tetrachloride, in failing to caution them to employ special care in the manner of loading or handling that substance and in failing to otherwise properly supervise and perform the loading operations. Nevertheless, since the duty to furnish longshoremen with a safe place to work is a nondelegable duty imposed by law upon the shipowner and requires, *inter alia,* that the shipowner warn the longshoremen of possible dangers to be encountered, the failure of Belgian Line to thus warn plaintiff is a sufficient basis for holding Belgian Line liable to plaintiff. However, '' The mere fact that both parties may be guilty of negligence in law as to the person injured does not necessarily mean that the owner [Belgian Line] and general contractor [Transoceanic] are *participes criminis* or *in pari delicto* as to each other.'' (*Tipaldi v. Riverside Memorial Chapel,* 273 App. Div. 414, 418, affd. 298

N. Y. 686.) Here Transoceanic, the stevedoring contractor, entered into an agreement with Belgian Line to perform the loading operations and it was under an obligation to do that work in a careful and prudent manner whether that duty was expressed in the contract or not. Transoceanic was in complete charge of those operations from the time the cargo reached the pier until it was loaded into the vessel save only insofar as Belgian Line made the choice as to where the various cargo was to be stowed. Clearly Transoceanic did not properly perform or supervise the work and as a consequence plaintiff was injured and the jury so found. Moreover, the " primary duty to furnish its employees a safe place to work [rests] upon the stevedore [employer]." (*Porello* v. *United States*, 153 F. 2d 605, 608, revd. in part and affd. in part *sub nom. American Steve-dores* v. *Porello*, 330 U. S. 446, *supra*.)

The evidence earlier outlined shows that Belgian Line was guilty of a fault of omission whereas Transoceanic, in negligently handling the drums, and Dow, in supplying inadequate drums, were guilty of faults of commission. (Cf. *Standard Oil Co.* v. *Robins Dry Dock & Repair Co.*, 32 F. 2d 182, 184.) While that is not always determinative, since either a fault of omission or one of commission may constitute active negligence, it seems to us that the factual disparity between the delinquency of Transoceanic and Dow and that of Belgian Line is so great here that the jury was justified in concluding that Belgian Line's fault of omission was only passive negligence.

The right of Belgian Line to a recovery over finds support in numerous cases among which are *Washington Gas Co.* v. *District of Columbia* (161 U. S. 316); *George A. Fuller Co.* v. *Otis Elevator Co.* (245 U. S. 489); *Burris* v. *American Chicle Co.* (120 F. 2d 218); *Standard Oil Co.* v. *Robins Dry Dock & Repair Co.* (32 F. 2d 182, 184, *supra*); *Schwartz* v. *Merola Bros. Constr. Corp.* (290 N. Y. 145), and *Tipaldi* v. *Riverside Memorial Chapel* (273 App. Div. 414, affd. 298 N. Y. 686, *supra*). None of those cases is vitally different from the present case. In all of them a plaintiff recovered against a person, such as Belgian Line, who was under a nondelegable duty to furnish a safe place to such plaintiff but in each case the primary and affirmative wrong was occasioned by the defendant against whom indemnity was sought and indemnity was

permitted. The rule enunciated in *Walters* v. *Rao Elec. Equipment Co.* (289 N. Y. 57) is not applicable here since no breach of section 241 of the Labor Law is involved. (See, also, *Semanchuck* v. *Fifth Ave. & 37th St. Corp.,* 290 N. Y. 412.)

Belgian Line has not urged that the stevedoring contract with Transoceanic contained an express covenant of indemnity. Nevertheless, the cases above cited establish the principle that, even in the absence of an express covenant of indemnity Belgian Line has the right to a recovery over against Transoceanic if the evidence be sufficient to establish Transoceanic as the primary wrongdoer. Indeed, as we said in *Oceanic Steam Navigation Co.* v. *Compania Transatlantica Espanola* (134 N. Y. 461, 467): " one who has been held legally liable for the personal neglect of another is entitled to indemnity from the latter, no matter whether contractual relations existed between them or not * * *." Therefore, even though Dow and Belgian Line were not parties to a contract the fact that Belgian Line has been cast in damages because of Dow's active negligence is a sufficient basis for permitting Belgian Line a recovery over as against Dow.

Although it is not urged here, passing mention should be made of an affirmative defense raised by Transoceanic but dismissed by the Trial Judge as insufficient in law. The substance of that defense is that by virtue of section 905 of title 33 of the United States Code, plaintiff's exclusive remedy against Transoceanic is under the Longshoremen's and Harbor Workers' Compensation Act and to permit Belgian Line or Dow a recovery over on an indemnity theory is to make the employer liable indirectly in an amount which could not be recovered directly. That same defense was argued before this court by an employer who had complied with the provisions of the New York Workmen's Compensation Law (upon which the Federal act was modeled), and we concluded that it was insufficient in law since the defendant in seeking a recovery over is not suing for the damage sustained by the employee but asserts its own right of recovery for breach of an alleged independent duty or obligation owed to it by the employer as indemnitor. (*Westchester Lighting Co.* v. *Westchester Co. Small Estates Corp.,* 278 N. Y. 175.) (See, also, *Burris* v. *American Chicle Co.,* 120 F. 2d 218, 223, *supra; Mirsky* v. *Seaich Realty Co.,* 256 App. Div. 658.)

The Federal rule does not appear to be different. " While the remedy afforded by the Longshoremen's Compensation Act is exclusive as between employer and employee, it does not nullify or alter the workman's rights as against third parties (*Seas Shipping Co.* v. *Sieracki,* 328 U. S. 85, 102). Nor does it bar the third party thus sued from recovering from the workman's employer damages such party is required to pay to the employee by reason of the employer's negligence. (*Green* v. *War Shipping Administration,* 66 F. Supp. 393, 395; *Severn* v. *United States,* 69 F. Supp. 21; *Benevento* v. *United States,* 68 F. Supp. 347; all maritime cases involving indemnification. * * * " (*Barbara* v. *Ransom, Inc.,* 191 Misc. 957, 960 (FROESSEL, J.) To the list of cases above cited may be added the later case of *Rich* v. *United States* (177 F. 2d 688, 691) where the United States Court of Appeals for the Second Circuit stated that the right to indemnity exists " despite the provisions of the Longshoremen's and Harbor Workers' Compensation Act ".

The judgment of the Appellate Division should be modified in accordance with the opinion herein, with costs in this court and in the Appellate Division to Belgian Line against Dow and Transoceanic, and, as so modified, affirmed, with costs.

LOUGHRAN, Ch. J., LEWIS, DESMOND, DYE, FULD and FROESSEL, JJ., concur.

Judgment accordingly.