Walter FILIPEK, Plaintiff,

v.

MOORE–McCORMACK LINES, Inc., Defendant and Third Party Plaintiff,

EASTERN RIGGING CORP., Third Party Defendant.

Civ. No. 13440.

United States District Court
E. D. New York.

Nov. 8, 1957.

Klein & Ruderman, New York City, for plaintiff. James W. Forsyth, Staten Island, N. Y., of counsel.

Kirlin, Campbell & Keating, New York City, for defendant and third party plaintiff. Walter X. Connor, Thomas F. Feeney, New York City, of counsel.

Lawless & Lynch, Purdy, Lamb & Catoggio, New York City, for third party defendant. Edmund F. Lamb, New York City, of counsel.

BRUCHHAUSEN, District Judge.

After a seven days trial, the jury rendered a verdict in favor of the plaintiff and against the defendant, also suing as a third party plaintiff, in the sum of $47,500 and absolved the third party defendant of liability.

The defendant-third party plaintiff now moves for a directed verdict in its favor and for alternative relief.

The action was instituted by the plaintiff, a ship's rigger and boom tester, against Moore-McCormack Lines, Inc., the owner of the S. S. Mormacsurf, to recover damages for personal injuries claimed to have been sustained by the plaintiff on December 23, 1952, by reason of the shipowner's negligence and unseaworthiness of the vessel.

The shipowner impleaded as third party defendant, Eastern Rigging Corp., hereinafter called "Eastern" or "the boom testers," the plaintiff's employer, upon the theory of indemnity.

## Facts Not in Dispute

The shipowner at and prior to the time of the accident was engaged in preparing the vessel for Canadian trade. One of the requirements therefor was that the masts or king posts and the booms be tested by experts in that field, pursuant to prescribed regulations, and the stamping of them by a representative of the American Bureau of Shipping, certifying to the tests.

The S. S. Mormacsurf, as is the case with cargo ships, was fitted with the equipment for the loading and unloading of freight into or out of the hatches or compartments. It consisted of stationary masts or king posts, movable booms or poles, capable of being lowered from an upright to an oblique or horizontal position by steel cables or runners, extending from the winches. The shipowner contracted with Eastern, a concern engaged in the business of testing masts or booms and rigging, authorizing it to test the equipment. Eastern thereupon caused ten of its employees, including the plaintiff to board the vessel on the morning of December 23, 1952. The group was divided into two gangs of about five men each. The first gang, including the plaintiff, lowered the boom to the desired angle for testing at Hatch No. 5 in the aft part of the ship, then at Hatch No. 1, forward, and then proceeded with a similar operation at Hatch No. 2, followed in each case by the second gang, engaged in testing the booms. The accident occurred while the first gang was working at Hatch No. 2 and the second gang was at Hatch No. 1.

The latter gang was in the act of applying pressure on the winch cable, measured by a scale attached to the boom, when the king post securing it snapped under the testing strain and broke off at a point about eight feet above the deck and fell in the direction of Hatch No. 2. The plaintiff was working with the second gang near that hatch and aiding in lowering a boom for testing. He was not struck by the falling king post but by the topping cable, attached to the boom at Hatch No. 2, which cable whipped across the deck and wrapped around his leg. The topping cable or lift was operated by hand and used by the workmen to lower the boom. At the time of the crash of the king post, one of the plaintiff's gang was paying out cable, while the plaintiff was taking kinks out of it and feeding it to a co-worker. When the members of the plaintiff's gang ran from their posts at the sound of the crash and gave up control of the topping cable, the boom dropped abruptly, releasing the cable, which snaked across the deck and injured the plaintiff.

### The Shipowner was not Liable upon the Ground of Unseaworthiness of the Vessel

■ Not only did the jury make a special finding that the shipowner did not warrant the seaworthiness of the king post to the plaintiff but the evidence established that the work in which the plaintiff was engaged was not of the nature ordinarily performed by seamen. Therefore, the plaintiff was not in a position to lawfully found a claim upon the ground of unseaworthiness. Bruszewski v. Isthmian S. S. Co., D.C., 66 F. Supp. 210, affirmed in 3 Cir., 163 F.2d 720, certiorari denied 333 U.S. 828, 68 S.Ct. 451, 92 L.Ed. 1113.

### As to the Plaintiff's Claim that the Shipowner was Negligent, Including the Contention that a Prior Occurrence was Notice to it that the King Post had been Damaged

The evidence of the prior occurrence on September 9, 1952, came from the plaintiff's witness John Weber and the ship's log. The latter exhibit disclosed that a runner attached to the boom at Hatch No. 1 had snagged on the deck and broken. No mention was made therein of any damage to the king post. However, the witness Weber, a former seaman on the ship, testified that when the runner broke he heard a cracking noise in the direction of the king post, that he made no statement about it to anyone until he related the incident to the plaintiff's attorney, shortly prior to the trial and about four and a half years after the accident. Apparently he made no inspection of the king post and makes no claim that there was a crack in the king post. Not only is there no evidence of a crack in the king post but we have the statement in the brief of the plaintiff's attorneys that "a mere visual inspection of the king post itself apparently did not disclose whether or not any damage had occurred to the king post as a result of the incident which took place on September 9, 1952."

The only other evidence which has any relation to the claim of negligence is the testimony of two of the plaintiff's co-workers that they saw some rust spots in the fractured area of the king post, upon examination made after it broke. There is no evidence that they existed or were observable prior to that time.

This leads to a consideration of the duty owed by the shipowner to a business visitor, such as was the plaintiff, and whether the plaintiff's injuries were caused by a violation of such duty.

■ That duty "is to use reasonable care to make the premises reasonably safe or else give warning of the danger." Spaulding v. Parry Nav. Co.; 2 Cir., 187 F.2d 257, 260, certiorari denied Parry Nav. Co. v. Todd Shipyards Corp., 342 U.S. 918, 72 S.Ct. 362, 96 L.Ed. 686. The obligation of a shipowner to give such warning, presupposes knowledge on its part of a dangerous or defective condition or its existence and failure to observe it, provided that it was discoverable by a careful inspection. Corrado v. Pennsylvania R. Co., 2 Cir., 171 F.2d

73, certiorari denied 336 U.S. 919, 69 S.Ct. 641, 93 L.Ed. 1081. The law does not require a shipowner to engage experts to make such inspection. Wild v. Atlantic Refining Co., 3 Cir., 195 F.2d 151, certiorari denied 344 U.S. 857, 73 S.Ct. 92, 97 L.Ed. 665. In this instance, if there were such a requirement, the shipowner would have been placed in the ludicrous position of employing expert inspectors for the purpose of ascertaining whether other experts, the plaintiff and his co-experts, should make an inspection of the equipment.

■ There is no evidence in the case at bar that the king post was defective at any time prior to the accident. It is possible that there was a hidden or latent defect in the metal, which reasonable inspection did not reveal, as the plaintiff mentions in his brief. But a shipowner is not liable for injuries caused by "a latent defect that a reasonable inspection by the shipowner or his agents would not show." Wholey v. British & Foreign S. S. Co., D.C., 158 F. 379, 380, affirmed 2 Cir., 171 F. 399.

Furthermore, even if a defective condition existed, it is plain that the plaintiff's injuries were not caused thereby. The king post did not snap or fall solely by reason of such defect. The plaintiff's co-workers by exerting some 14,000 pounds pressure on the boom at Hatch No. 1 and the king post caused it to fall.

■ The duty to furnish a safe place to work does not apply to a situation as in the case at bar wherein the work done by the plaintiff and the other boom testers created the danger. In Byars v. Moore-McCormack Lines, 2 Cir., 155 F. 2d 587, the Court quoted from the case of Mullin v. Genesee County Electric Light Power & Gas Co., 202 N.Y. 275, 95 N.E. 689, 690, wherein the Court said:

"That rule (creating the duty to furnish a safe place to work) does not apply 'where the prosecution of the work itself makes the place and creates the danger.' * * * The reason for this exception to the general rule is that it would be manifestly absurd to hold a master to the duty of providing a safe place, when the very work in which the servant is engaged makes it unsafe. If a man is engaged in tearing down a house, he is constantly exposed to dangers of his own creation; and in such a case all those who are engaged in the same common purpose are fellow-servants for whose negligence in executing the details of the work the master is not liable, even though 'the work is done in successive stages, different parts thereof being devolved upon different persons, and the labor performed by one set of employes being prior in time to that performed by another set.' "

■ It is plain that even if the plaintiff's proof as to the cracking noise heard by Weber, three and a half months prior to the accident, and the rust spots claimed to have been found on the king post after the accident, be accepted as true, that he failed to establish a lawful claim of negligence, under the authorities hereinabove referred to.

Furthermore any such finding of negligence would be against the weight of all of the evidence. In the first place, Weber's statement is uncorroborated, although a number of others were present when the runner broke. Besides, if it did happen, why didn't he report it and not wait four and a half years to disclose it and then only to the plaintiff's attorney on the eve of trial? Weber's testimony, which was taken by deposition, was flatly contradicted by a former member of the ship's crew, Perry Gaumas, who testified not only that Weber was not present on the day in question but had left the ship and failed to return and pay a debt he owed to Gaumas. In addition, the defendant's uncontradicted evidence that the equipment, including the king post, was used for the period from September 9, 1952, the date when the runner broke to December 23, 1952, the date of the accident, in active and heavy cargo operations is convinc-

ing proof that the king post was in good working condition.

### As to the Claim of Indemnity

Another reason why the verdict should not stand arises out of the indemnity claim. The shipowner, in its pleading, based its indemnity claim against the rigger and boom testers upon the theory that the contract contained an implied provision that the testing operation would be performed in a reasonably safe manner. The case of Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, is authority therefore.

██ Inadvertently, the Court, in connection with this phase of the case, charged at some length on the subject of active and passive negligence, which have no place in an indemnity claim implied in fact, although they do apply in situations involving indemnity implied in law, as demonstrated in the case of McFall v. Compagnie Maritime Belge, 304 N.Y. 314, 107 N.E.2d 463. There was a strong indication that the jury was confused if not misled on the subject, especially in that no reference to active and passive negligence was made in the questions submitted to the jury as a basis for a special verdict and the jury requested a re-reading of this portion of the charge. The jury may well have concluded that in order to find the indemnitor rigging concern liable it must find that it committed active negligence and the shipowner passive negligence. It was stipulated that the snapping of the king post was not caused by the method employed in testing at Hatch No. 1. Thus the shipowner's claim for indemnity was limited to the theories that the boom arrangers worked too closely to the testers and that the safest method of lowering the boom at Hatch No. 2 was by cleat rather than gypsy head. In fact, these were the only theories alleged by the shipowner. When the jury found the shipowner negligent in failing to warn the plaintiff of danger, it should also have found the rigger liable, so strict was the liability that the jury im-

posed. If the rigger had any part in causing the plaintiff's injuries, this should have relieved the shipowner of strict liability.

The shipowner's motion for a directed verdict in its favor is granted. Settle order on five days' notice.