LUCY CARINHA, as Administratrix of the Estate of JOSE CARINHA, Also Known as JOSEPH CARINHA, Deceased, et al., Respondents-Appellants, v ACTION CRANE CORP. et al., Respondents, and TURNER CONSTRUCTION Co. et al., Appellants-Respondents, et al., Defendant.

First Department, June 28, 1977

*Pamela Anagnos Liapakis* of counsel *(Lipsig, Napoli, Sullivan, Mollen & Liapakis, P. C.,* attorneys), for respondents-appellants.

*William J. Steinbrecher* of counsel *(Steinbrecher & Paradise, P. C.,* attorneys), for Government Employees Insurance Co., Inc., appellant-respondent.

*Raymond C. Green* of counsel *(Francis Hugh McDermott* with him on the brief; *Peter M. Pryor,* attorney), for Westbury S. & S. Concrete Co., Inc., appellant-respondent.

*Solomon M. Cheser* of counsel *(Tell, Cheser, Breitbart & Lefkowitz,* attorneys), for Action Crane Corp., respondent.

*Patricia D'Alvia* of counsel *(Morris, Duffy, Ivone & Jensen,* attorneys), for Drott Co., respondent.

*Richard Bakalor* of counsel *(Quirk & Bakalor, P. C.,* attorneys), for Plainview S. & S. Concrete Co., Inc., and another, appellants-respondents.

*William F. McNulty* of counsel *(Anthony J. McNulty* with him on the brief; *Craig, Betelsky & Lockhart,* attorneys), for Turner Construction Co., appellant-respondent.

*Harry H. Kutner, Jr.,* for John Harrington, appellant-respondent.

CAPOZZOLI, J. I agree with the opinion of Mr. Justice LUPIANO, except as to that portion which would affirm the trial court's dismissal of the complaint against the defendant, Action Crane Corporation, at the close of the case on the ground that, as a matter of law, Harrington, the crane operator, was not an employee of the defendant, Action, when the accident happened. I am of the opinion that, in view of the specific terms of the lease contract entered into between Action and S. & S. Concrete, Harrington, at the very time of the accident, was still representing Action, as he did when he went to the Action yard on the instructions of Action, greased the crane and then drove it to the job site, again on the instructions of Action. Therefore, the trial court should have submitted the issue to the jury to decide.

While it is true that Harrington was to be paid by the S. & S. defendants when operating the crane at the job site and further that he was subject to their instructions, it must be emphasized that this would be true only after the crane had been properly placed in a safe and stable position, ready to do

the work for which it was hired and for which the operator was furnished by Action.

It must be noted that, under the terms of the contract, Action not only leased the equipment, but also "furnishes operational personnel to the lessee". Obviously, since Action reserved the right to furnish its own operator, it must be held to have represented to the lessee that this operator, Harrington, was competent and able to perform the duties which were required to be performed under the contract.

Great reliance is placed by Action on the case of *Szarewicz v Alboro Crane Rental Corp.* (50 AD2d 770 affd 40 NY2d 1076). The contract which leased the crane in the last-cited case is vastly different from the contract in the case at bar. The latter, amongst other things, provides as follows: "The lessor hereby leases the equipment described on the reverse side *and furnishes operational personnel to the lessee."* (Emphasis supplied.)

Nowhere in the contract considered in *Szarewicz (supra)* is there any indication that the lessor in that case was to furnish the operator, nor did it furnish him. That agreement simply covered the rental of the crane and called for nothing else to be done by the lessor. In fact, a reading of that agreement denotes that the lessee was to furnish his own operator because it also provided that Alboro was to "on request, furnish the services of a mechanic without charge to demonstrate it and *instruct your operator."* (Emphasis supplied.) In another portion of the same contract we find that the lessee was to return the crane to Alboro "in as good condition as received less wear incident to normal use *in the hands of a competent operator".* (Emphasis supplied.)

None of this language is found in the contract involved in the case at bar. On the contrary, it is to be repeated that Action specifically reserved unto itself the furnishing of the operator. It must follow that it impliedly represented that the operator furnished by it would be competent, able and could be trusted to perform the duties called upon him to perform at the job site.

It seems to be perfectly reasonable that one of the duties of the operator of the crane was to set it up, at a place indicated by the lessee, in a safe and stable position. It was only after the operator of the crane had carefully and safely erected the crane that the lessee could then use it for the purposes for which it had been leased. But the operator failed to erect the

crane in a stable position because, before the actual work of the lessee was begun, the crane toppled over. It is clear from the evidence that the toppling over of this crane was due to the improper placement of same by the operator and because of his negligence and incompetence. There is nothing in the record to indicate that the lessee assumed the duty of placing the crane in a safe and stable position. This was the job of the lessor's operator.

It should be noted that the lease contract, in paragraph 2 thereof, makes frequent mention of "lessor's employees". What lessor's employees could they be talking about except for Harrington? Other than Harrington there was no one else on the job site who could possibly be an employee of the lessor. In the same paragraph we find the following: "Lessee shall not be required to indemnify lessor for its sole negligence, but, lessor's liability for damage caused by the sole negligence of lessor, its agents and employees, hereunder shall be limited to the amount of lessor's liability insurance."

This is a specific provision by which the lessor agrees to become liable for damages caused by its employees. Again, the question is asked. Who are the employees other than Harrington?

A fair question of fact was presented as to whether, when the accident happened, the operator, Harrington, was acting as an employee of the lessee or was still performing the work which was his duty to perform for the lessor, viz: erecting the crane in a safe and stabilized position, and it should have been submitted to the jury.

The evidence discloses that Harrington had a long-standing relationship with Action, having first worked for Action as an oiler and then as an operator. While it is true that Harrington appeared on more than 56 different payrolls during the year 1971, he also appeared on the books of Action as an employee and was paid $1,484.27 as wages by Action, during the same year. Harrington consistently worked upon Action equipment. When a job terminated Harrington would continue to report to Action's yard and take his work assignments from Action's dispatchers. In fact, following the happening of the accident, Harrington told the investigators of the Police Department and Department of Labor that he was employed by Action Crane Corporation. Again, at his examination before trial, held in May, 1973, he stated that, when he received his operating engineer's license, he was first employed by Action

and that he continued to work for Action up to the date of this examination. However, five days before the trial, Harrington changed this testimony.

For the reasons given, the judgment of the Supreme Court, New York County (CHIMERA, J.), entered on March 12, 1975 should be modified, on the law and on the facts, to the extent of reversing so much thereof as (1) dismisses the complaint against defendant, Action Crane Corporation, and, (2) dismisses the cross complaints and cross claims of defendants, Turner Construction Company, Harrington, Plainview S. & S. Concrete Co. Inc., Geico, S. & S. Concrete Corporation and Westbury S. & S. Concrete Company, Inc., against Action Crane Corporation; and the interlocutory judgment entered on June 4, 1975, should be modified, on the law and on the facts, to the extent of reversing so much thereof as (1) dismisses plaintiffs' complaint against defendant, Harrington, based upon sections 11 and 29 of the Workmen's Compensation Law; (2) awards judgment to Turner and Geico against Plainview, S. & S. and Westbury based upon common-law indemnity and (3) apportions damages between Plainview, Harrington, S. & S. and Westbury, and a new trial ordered on the issues thus remaining. As modified, the judgments should be affirmed, with costs to plaintiffs as against defendants, Turner and Geico, and costs to abide the event as to the other litigants.

MURPHY, P. J. (concurring in part and dissenting in part). When Garrido, the foreman, directed Harrington to place the crane in a particular location, Harrington did not automatically become a special employee of any of the S. & S. defendants by reason of that directive. (Stone v Bigley Bros., 309 NY 132.) The jury should have been permitted to decide whether Harrington, while setting up the crane for operation, remained in Action's employ or had become, at that point in time, a special employee of one or more of the S. & S. defendants. With the exception of Drott's cross claim, all other claims and cross claims against Action should be reinstated and a new trial held to determine the respective liability, if any, of all remaining parties.

Likewise, the trial court should not have found, as a matter of law, that the three S. & S. defendants comprised a single entity. Although the accountant for the S. & S. corporations may have believed that they formed a single business entity, this fact is not a sound or compelling reason for the court to treat them as one corporation. Upon retrial, the jury should

be permitted to determine the respective employers for all the workmen involved in this occurrence. At that time, the jury should be allowed to decide whether the three S. & S. corporations should be treated as a single employer or as three independent employers.

I agree with the trial court that the crane falls within the ambit of subdivision 1 of section 240 of the Labor Law (cf. *Ranney v Habern Realty Corp.,* 279 App Div 426). I further agree that subdivision 1 of section 240 places a nondelegable duty upon the owner and a general contractor. *(Rocha v State of New York,* 45 AD2d 633 , lv to app den 36 NY2d 642.) So too, I would not hesitate to permit an owner or general contractor to be indemnified under appropriate circumstances for any liability incurred under subdivision 1 of section 240. Since an indemnitor would be directly liable to an owner or general contractor for a breach of its own duty, that indemnitor should not be permitted to look to its own employee for contribution.

With foregoing guidelines in view, I would modify the judgment, entered March 12, 1975, by reversing all portions of the three decretal paragraphs except for the portion of the second paragraph as dismisses Drott's cross claim against Action, and as so modified, I would otherwise affirm. I would also modify the interlocutory judgment, entered June 4, 1975, by reversing decretal paragraphs 3 through 12, by reinstating all claims and cross claims specified therein, and, as modified, I would otherwise affirm. Upon modification, all remaining claims should be remanded for a new trial.

LUPIANO, J. (dissenting). The lawsuit herein arises from a construction accident which occurred on September 27, 1971, at a job site in Woodbury, Long Island, where a building to be known as the GEICO Building was being constructed. Jose Carinha, deceased, and Thomas C. Ryan were carpenters employed by the concrete subcontractor at the site. Defendant Government Employees Insurance Co., Inc. (GEICO) was the owner of the work site and had retained defendant Turner Construction Co. as its general contractor to construct the building. Turner retained defendant Plainview S. & S. Concrete Co., Inc. as the concrete contractor to do the concrete work on the job site. Prior to the accident, Turner turned over the area where the accident occurred to the concrete subcontractor so that the latter could perform its work. In the process of erecting the foundation at the site, the concrete

subcontractor utilized a crane leased from defendant Action Crane Corp. for the purpose of lifting or hoisting concrete by means of a bucket from the bottom of the excavation. The crane was operated by defendant John Harrington. Defendant S. & S. Concrete Corp., Inc. (together with defendant Westbury S. & S. Concrete Co., Inc.) may be termed a "sister" corporation of defendant Plainview. Jose Carinha, deceased, Thomas C. Ryan and John Harrington were on the payroll records of Westbury on the day of the accident. The complaint was dismissed on consent as to defendant Drott Co., the manufacturer of the crane, and the action was discontinued prior to trial as to defendant T. J. Burke & Sons, Inc., the distributor of the crane.

Harrington, after obtaining the crane at Action's yard on the morning of September 27, 1971, drove it to the job site. He contacted Angelo Garrido, the foreman of defendant Westbury who was in charge, and received instructions from the latter as to where the concrete pour was to occur. After driving the crane down a ramp to the bottom of the excavation around which wooden forms had been erected into which the concrete was to be poured for the construction of the foundation walls, Harrington, unsupervised, positioned and stabilized the crane by hydraulically extending the outriggers of the crane and dropping the pistons (legs) to which metal rectangular pads were attached to the ground. There was no cribbing (the placement of pieces of wood one on top of the other at angles upon which the outrigger pads rest thus spreading the load on unlevel, soft, wet or otherwise unstable soil) or placement of planks underneath the crane. When the first bucket of concrete was raised and swung toward the wooden forms into which the concrete was to be poured, the crane toppled over, thereby striking and killing Jose Carinha and seriously injuring Thomas Ryan.

Initially, it is concluded that the record affords ample basis for concluding that the soil at the place where the crane was to be used was unstable, requiring cribbing or a similar safety measure to adequately stabilize the crane. Thus, it was properly found that there were concurrent proximate causes of the accident in the placement and manner of the operation of the crane.

At the end of the entire case, the Trial Justice dismissed plaintiffs' complaint against Action Crane Corp., the crane lessor, on the ground that Harrington, the crane operator, was

an *ad hoc* employee of one or more of the "S. & S. Concrete" corporations. It is well recognized that "[a] servant in the general service of one person may be transferred for a limited time to the service of another, who then becomes responsible for his negligence. An employer is not liable for injuries negligently caused by a servant if the latter is not at the time in the service of the employer, but in the special service of another * * * The decisive test in determining who is the employer of a particular employee who has caused an injury is not necessarily the payment of wages, but who directs the movement of the employee * * * In determining whether the general master of a servant or one by whom the servant is borrowed or hired is responsible for the servant's acts, the person deemed the master is he who has the supreme choice, control, and direction of the servant, and whose will the servant represents not merely in the ultimate result of his work, but in all its details" (37 NY Jur, Master and Servant, § 154). Harrington appeared on more than 55 different payrolls during the year 1971 as a consequence of his being in the special employ of some 55 contractors or subcontractors for whom he performed work in operating a crane leased from Action. The crane utilized in this matter was leased by "S. S. Concrete" according to the crane rental agreement dated September 27, 1971 which specified the job site as "Geico Building Woodbury L.I. N Y."[1] Angelo Garrido, the foreman at

1. This agreement, entitled "Standard Short Term Crane Rental Agreement," was identified at trial as plaintiffs' Exhibit 4-A and 4-A-1 and admitted into evidence. Relevant to this, defendant Action's Exhibit X in evidence is an invoice for the crane rental at issue which describes the transaction as a "(b)are rental of hydracrane." This term as testified to by Action's president and general manager, one Wheeler, means that the contractor assumes complete control, i.e., the responsibility for the equipment and supervision of its operation, whereas the term "crane service" means that Action contracts to do the job and pays and supervises the operator. Further admitted into evidence was the standard crane rental agreement of Action dated March 17, 1971 for a prior job at J. C. Penney's Roosevelt Field. The lessee was "S. & S. Concrete" and the foreman Garrido's signature appears thereon (he admitted his signature at trial). It may be concluded under the prior course of conduct between Action and the "S. & S. Concrete" corporations, the custom and usage in the trade and the circumstances occurring at the job site on the day of the accident that control and supervision of the crane operator rested with the concrete subcontractor.

Further, Garrido testified that the signature on plaintiffs' Exhibit 4-A appeared to be his but that he could not recall signing same. He asserted that Harrington did not give him the agreement to sign the day of the accident. Harrington, prior thereto, had testified that when he reached the job site and met Garrido, he obtained Garrido's signature on the "ticket," the standard crane rental agreement. Garrido admitted that is was standard practice for him to sign for the crane when he was foreman in these "concrete jobs."

the job site, signed the agreement on the line provided for the "Customer's Name" immediately below a bold type legend declaring: "The Terms And Conditions Governing This Rental As Described On The Reverse Side Are Understood And Agreed To." The "Terms And Conditions" provide in pertinent part as follows: "The Lessor hereby leases the equipment described * * * and furnishes operational personnel to the Lessee heretofore named subject to the following terms and conditions: * * * 2. Lessee agrees that the equipment and all persons operating such equipment, *including Lessor's employees* [emphasis supplied], are under Lessee's exclusive jurisdiction, supervision and control. 3. *Competent Operation By Lessee:* Lessee agrees to provide competent and experienced personnel *to direct the operation* [emphasis supplied] of the equipment and further agrees that the Standard Crane and Derrick Signals in accordance with U.S.A.S. B 30.5-1968 shall be used to direct the equipment at all times when applicable."

Harrington testified that after being notified by Action's dispatcher of the leasing of the crane, on the morning of the accident he picked up the crane at Action's yard and delivered it to the job site where he asked to see the foreman in charge, who on this occasion was one Angelo Garrido. Mr. Garrido instructed Harrington as to where the concrete pour was to occur and after discussing the work, Harrington drove the crane to the place indicated. In a statement given by Harrington to Action Crane, admitted into evidence, the former declared that he belonged to "Local 128 of the International Union of Operating Engineers [and is] assigned by the local to operate cranes when a crane operator is needed. Any crane lessor calls the local and asks for an engineer. The union assigns an engineer to any lessor requesting an engineer according to union regulations * * * I picked up the crane in Action's yard * * * I took the crane out of Action Cranes without a bucket. I came to the job site * * * Angelo Garrido, foreman * * * was on the job site. [He] hooked the bucket to the crane and then he told me to take the crane and the bucket down to put it into position for pouring concrete * * * Garrido directed me to make the first pour and the crane went over." Garrido, the foreman supervising the concrete work, testified that he went down with Harrington into the excavation hole and then got off the crane after directing the latter as to what part of the wall the concrete pour was to occur. He then left Harrington to position the crane while he

went "to see [his] other men." He admitted that he did not pay any attention to the ground when he jumped off the crane after instructing Harrington where to position it and he assigned a man to give Harrington signals in the operation of the crane.

Here it was agreed that the crane lessor would furnish a crane operator to the lessee. This circumstance of itself does not remove this case from the ambit of the rationale delineated in *Dicenzo v New York Shovel & Crane Corp.* (282 App Div 741, affd 308 NY 871 and *Szarewicz v Alboro Crane Rental Corp.,* 50 AD2d 770, affd 40 NY2d 1076), because it was further agreed that the crane operator (even if an employee of the lessor) would be under the exclusive control of the lessee. The circumstances disclosed upon scrutiny of the instant record demonstrate that the crane operator was subject to and understood that he was subject to the exclusive control of the lessee. In *Dicenzo (supra),* one of the lessor's officers did operate the crane during the rental period *at the request of the lessee* and during such operation was on the payroll of the lessee. The Second Department observed that in effect the lessor had agreed "merely to rent the crane to [the lessee]. At most [the lessor] may have supplied [the lessee] with a servant to work in [the lessee's] business. But [the lessor] did not agree to do the operating of the crane for [the lessee] through the agency of one of [the lessor's] employees," citing *Irwin v Klein* (271 NY 477, 486). In *Irwin v Klein (supra,* pp 485-486), the Court of Appeals noted that "[i]f the general employer's contract is to furnish an employee who will do the specified work under the supreme direction and control of the person for whom the work is to be done, the workman becomes for the time being the servant of the person to whom he is furnished. The general employer's 'business' in the matter does not include the doing of the work. He has no control of the manner in which it is performed, and the workman though hired by him does not act as his agent but as the agent of his employer for the time being to whose orders he must submit." Of further relevance is this court's holding in *Szarewicz v Alboro Crane Rental Corp. (supra,* pp 770-771) when it was concluded "that the operator of the crane was never a general employee of [the lessor] * * * [I]t appears that as an experienced crane operator he was merely informed of jobs in which the crane was to be used, either through a union or, as in this case, through [the lessor]. Such practice was apparently

followed because only qualified persons were permitted to operate the type of crane herein involved * * * Nor was there evidence indicating that [the lessor] had any control over the crane óperator. Not only was the operator carried on [the lessee's] payroll, but [the lessor] had no right to hire or discharge him. Furthermore, it appears that according to both the custom and usage in the trade and the actual practice on the job at the time of the accident, supervision of the crane operator and the details of his work was solely in the hands of [the lessee]". Most recently, this court in *Pichardo v Kreger Truck Renting Co.* (57 AD2d 177) held that an employee in the general employ of one business entity was a loaned servant in the special employ of another business entity where the former contracted him to the latter, to follow instructions of the latter. The critical factor was again the surrender of direction and control.

While the trial court at the conclusion of the trial and before charging the jury dismissed all claims against defendant Action Crane Corp. finding as a matter of law that Action was not the general employer of the crane operator, we conclude, giving every favorable inference reasonably drawn from the evidence to Action's opponents, that even assuming the crane operator to be in the general employ of Action, it was conclusively established that the crane operator was at the very least a loaned servant in the special employ of the concrete subcontractor subject to the exclusive control and direction of the latter. Accordingly, the trial court's determination to dismiss the claims against the crane lessor was correct.

As to employment status, the jury found defendant Harrington, the crane operator, to be an employee of defendants Plainview S. & S. Concrete Co., Inc. and S. & S. Concrete Corporation and found Jose Carinha, deceased, Thomas C. Ryan, and Angelo Garrido to be employees of defendant Westbury S. & S. Concrete Co., Inc. As to negligence, the jury found defendant GEICO, the owner, not negligent, and found defendant Turner Construction Co., the general contractor and defendant S. & S. Concrete Corp. negligent, but that their negligence did not proximately cause the accident. Defendants Harrington, Plainview S. & S. Concrete Co., Inc. and Westbury S. & S. Concrete Co., Inc. were found to have proximately caused the accident through negligence. The trial court perceiving the inconsistency in the jury's determination to the

effect that Harrington, whose negligence was a proximate cause, was also found to be an employee of S. & S. Concrete Corp., set aside the jury's finding that the negligence of S. & S. Concrete Corp. was not a proximate cause of the accident. In an articulate, well-reasoned and erudite opinion, after the jury submitted its findings and was discharged, the Trial Justice (CHIMERA, J.) observed in pertinent part that "[t]here was more than enough in the largely uncontradicted testimony affecting the activities of the three 'S. & S.' defendants to establish conclusively that the three of them, in effect, constituted a single entity with identical officers and stockholders, the creation of three separate corporate structures emerging as a murky, unabashed device inspired by their accountant (who for obvious reasons remained 'aloof from the fray'), to spread earnings and expenses across the books of the three 'S. & S.' defendants with the avowed objective of taking advantage of a lesser income tax burden consistent with three separate lower-bracket taxable incomes. Call it what you will —*piercing the corporate veil, agency, joint venture or overtones of general and special employment* on no rational basis could the jury have found otherwise than that the 'S. & S.' defendants, together, constituted a single employer of the late Carinha, plaintiff 'Ryan,' defendant 'Harrington' and the foreman 'Garrido,' and on this conclusion, plaintiffs' complaint must be dismissed as against the three 'S. & S.' defendants and also as against defendant 'Harrington' by reason of Workmen's Compensation Law §§ 11 and 29, which afford a complete defense to each of those defendants." The cognomen "S. & S. Concrete" appearing on the crane lease agreement is common to these defendants—Plainview *S. & S. Concrete* Co., Inc., *S. & S. Concrete* Corp. and Westbury *S. & S. Concrete* Co., Inc. All three defendants as disclosed by examination of the record enjoyed a community of interests. A *single* workmen's compensation policy covered the employees of all three defendants. Although the general contractor subcontracted with Plainview for the concrete work, Plainview utilized workmen supervised by the foreman Garrido who were paid by Westbury. Indeed, Garrido, reflective of his subjective belief, declared that he was Westbury's employee at the time of the accident and he was on Westbury's payroll. Plaintiffs do not take issue with the substanitally unrefuted testimony showing that the S. & S. corporations operated in a manner whereby contracts were divided between Plainview and Westbury in terms of who did the work, regardless of which entity was

named in the subcontract with a contractor, so that at year's end the incomes of these corporate entities were relatively equal. Employees appeared at different times on the payrolls of one or another of these corporations. Indeed, decedent Carinha appeared at different times on the payroll cards of each of the "S. & S." defendants. Essentially, plaintiffs' plaint is that the principal behind the "S. & S." defendants is permitted to utilize the corporate forms for tax avoidance, but under these circumstances is allowed to disregard the separate corporate forms in order to invoke the defense of workmen's compensation of behalf of all the "S. & S." defendants.[2] This plaint does not form a cognizable basis for invoking equitable estoppel against the "S. & S." defendants attempting to raise the bar of workmen's compensation as to each and all of them. Clearly, the "S. & S." defendants were operating under the famous dictum of Dumas' "Three Musketeers"—"One for all and all for one." The trial court did not "pierce the corporate veil", that is, treat as identical the corporation and the individual or individuals owning all its stock and assets. Rather, the trial court looked beyond the fiction of the separate "S. & S." corporations and held them to constitute a single unit in legal contemplation. This is permissible where each corporation is so related to, or organized, or controlled by, the other as to be its mere agent, instrumentality, or *alter*

---

2. On a pragmatic basis, plaintiffs do not secure greater relief or advantage if the corporations are not regarded as agents or instrumentalities to the extent of being deemed jointly the employer of Carinha, Ryan, Garrido and Harrington. Not so regarded as a joint employer, it is clear that Plainview in effect sub-subcontracted the concrete work to its sister corporation Westbury. The jury found—and there is support for their finding—that Garrido, the foreman in charge, Carinha and Ryan were employees of Westbury. Harrington reported to Garrido and was subject to his direction and control. Similarly, Harrington was paid by Westbury as were Garrido, Carinha and Ryan. Plainview did not supervise and control Harrington's work or the work being performed at the job site. This was Westbury's function. The jury found Harrington to be employed, not by Westbury, but only by Plainview and S. & S. Concrete Corp., which determination they could arrive at as reasonable men only through a conclusion that Westbury and Plainview were, in effect, unified in interest. It is beyond cavil on this record that the indicia of a master-servant relationship respecting Harrington compelled the conclusion that he was in the special employ of Westbury. Westbury paid Harrington and he was subject to Westbury's control. To conclude otherwise requires reassessment of the jury's view as to Garrido's employment status and the relationship of the "S. & S." defendants. If Harrington is deemed Westbury's and not Plainview's employee, then both Harrington and Westbury may claim the bar of workmen's compensation against plaintiffs' claims and Plainview and S. & S. Concrete Corp. not being in control, the work having been in effect sub-subcontracted to Westbury, they should not be cast in liability to plaintiffs as their negligence, if any, was not a proximate cause of the accident.

*ego.* As aptly stated in *Shelton Holding Corp. v 150 E. 48th St. Corp.* (264 NY 339, 344): "[t]he principal * * * had a right to do business in the corporate form. He might, if he chose, organize and direct two or more corporations as business instrumentalities. These corporations then must be regarded as separate legal entities, but the fact that a single mind and a single will direct the activities of these separate entities carries with it the consequences which naturally flow therefrom. The same knowledge and the same intent must be ascribed to all." Further, "[t]he courts will also look beyond the fiction of corporate entity, and hold two corporations, in legal contemplation, to be but one unit, where one is so organized, related to or controlled by the other as to be its mere agent, instrumentality or *alter ego*" (*Pagel, Horton & Co. v Harmon Paper Co.,* 236 App Div 47, 48-49). Having concluded that the "S. & S." corporate defendants are in legal contemplation one unit, it follows that the trial court correctly viewed Ryan, Carinha, Harrington and Garrido as employed by a single employer, to wit, the "S. & S." defendants and properly dismissed plaintiffs' complaint as to Harrington (a coemployee) and the "S. & S." defendants (the employer) by reason of the workmen's compensation defense.

Under subdivision 1 of section 240 of the Labor Law "[a]ll contractors and owners and their agents, in the erection * * * of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, *hoists,* stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, *placed and operated as to give proper protection to a person so employed*" (emphasis supplied). In initially considering the question whether the crane utilized by the concrete subcontractor herein comes within the ambit of this statute, it is well to note that the statute has been liberally construed by the courts to accomplish its beneficial purpose of securing better protection for workmen (see *Sarnoff v Charles Schad, Inc.,* 22 NY2d 180; *Rocha v State of New York,* 45 AD2d 633, lv to app den 36 NY2d 642). The crane herein is a machine possessing multiple functions (see *Monell v International Business Machs. Corp.,* 47 AD2d 637, 638). It was needed by the concrete subcontractor to fulfill a particular need, to wit, the lifting or hoisting of buckets of concrete from the bottom of the excavation to the top of the wooden forms at which point the concrete would be poured into the forms and would harden to constitute a concrete foundation for the

GEICO building. Once the crane was positioned and stablized by the hydraulic extension of its outriggers and the dropping of the pistons (legs) attached thereto to the ground, its sole function was to serve as a hoist, that is, an apparatus for raising or lifting heavy objects, in this case—buckets of concrete. Under the circumstances, the Trial Justice correctly determined that the crane constituted a hoist within the meaning of subdivision 1 of section 240 of the Labor Law.

The fact that the owner retained a general contractor to perform the work, who in turn subcontracted to the concrete subcontractor (the "S. & S." corporations), does not serve to insulate the owner and general contractor from liability under the statute. "[T]here would have been no liability against the * * * owner, prior to the 1969 amendment to section 240. Prior thereto, the statute imposed liability for its violation on 'A person employing or directing another to perform labor of any kind.' As amended, it imposes liability on 'All contractors and owners and their agents' * * * A mere reading of the new language reveals the change to be a substantial one, for it imposes liability on a new category, i.e., an owner. Prior to the change, an owner was subject to liability only if he was also an employer or one directing the worker to perform his labor. Amended at the same time as section 240 was section 241 of the Labor Law. (L 1969, ch 1108, §§ 1, 2, 3.) The opening words of both statutes are now identical. Liability was imposed on owners and contractors, however, under section 241 prior to the amendment * * * In considering an owner's liability under section 241-a prior to the 1969 amendment, the following language was used by [this] court in *Haskins v. City of New York* (28 AD2d 656): 'While section 240 of the Labor Law may not apply to an owner who engages an independent contractor to perform the work, section 241 does impose a nondelegable duty on owners.' Considering liability under section 241-a, [this] court held, 'The purpose of section 241-a being similar to that of section 241, the sections should be read *in pari materia.* Therefore, we conclude that section 241-a casts a nondelegable duty upon [the owner]' * * * A study of the cases analyzing various sections of article 10 of the Labor Law compels us to conclude that is was the intent of the Legislature, in amending section 240 of the Labor Law, to impose a nondelegable duty on an owner, as such, in order to bring that section into line with sections 241 and 241-a where such duty already existed. Furthermore, the clear and unam-

biguous language of the amendment compels such a conclusion * * * [t]he memorandum submitted by the [1969 amendment] bill's authors * * * specifically states that the purpose of the bill was to place the responsibility for safety practices on the owner and general contractor, where it belongs" *(Rocha v State of New York, supra,* pp 635-636). Thus, the primary and nondelegable responsibility respecting the proper protection to the workmen in the cement hoisting operation rests with the owner and general contractor "who have the means of protecting themselves financially and otherwise by agreements with those they hire" *(Rocha v State of New York, supra,* p 637).

The owner GEICO and the general contractor Turner Construction Co. assert that they can maintain the workmen's compensation defense available to Harrington and the employer of Ryan and Carinha on the theory that they are liable vicariously under the Labor Law in the same sense as is the owner of a motor vehicle for the negligence of the driver who operates the vehicle with the owner's consent. This contention is untenable. The liability of an owner and general contractor under section 240 of the Labor Law does not sound in derivative liability. Rather, the owner and general contractor are cast in liability by virtue of the first instance liability which arose from breach of the duties imposed by said statute, which first instance liability could not be delegated as against persons injured by the breach of said duties.[3] As critically observed by the Trial Justice: "[o]bviously the critical difference between the statutory liability of an owner of a motor vehicle under Vehicle and Traffic Law § 388 and that of owners and general contractors under Labor Law § 240 is that § 388, supra., imposes liability but no duties at all on the owner of a motor vehicle, his liability being vicarious in every meaningful sense of that much abused term."

The owner and general contractor are entitled to common-law indemnification under section 240 of the Labor Law from those whose negligence caused the accident, that is, from those who breached the duties imposed by said statute and in

---

3. Chief Judge Breiltel in the key case of *Kelly v Diesel Constr. Div. of Carl A. Morse, Inc.* (35 NY2d 1, 7) in analyzing section 240 of the Labor Law stated: "the use of the term 'nondelegable' was applied properly not to duties that could not be delegated but to liabilities arising from the delegated duties if breached. The fact and the law always was that the duties could be delegated but that first instance liabilites which arose from the breach of the duties could not be delegated as against persons injured by the breach of the duties."

so doing cast the owner and general contractor in first instance liability to plaintiffs *(Kelly v Diesel Constr. Div. of Carl A. Morse, Inc.,* 35 NY2d 1). "The older rule that sections 240 and 241 deprived an owner or general contractor, regardless of where the fault lay, of the right to contribution or indemnification for construction, maintenance, excavation, or demolition accidents is no longer applicable. This is so in light of the universality of insurance and current doctrine favoring apportionment of damages among joint tort-feasors \* \* \* There is no good reason to continue the artificial policy involved in denying an owner or contractor, liable vicariously only under the applicable sections of the Labor Law, from obtaining indemnification under common-law principles, or, in a proper case, contribution under the doctrine in *Dole v. Dow Chem. Co.* [30 NY2d 143]. The owner or general contractor almost universally, if not indeed universally, covers his liability, primary or secondary, with liability insurance. In most instances he requires a covenant of indemnification from his subcontractors or suppliers, which the courts have always accepted as enforceable and not a violation of public policy \* \* \* Sections 240 and 241 \* \* \* mandate first instance liability on the owner or general contractor so that, with respect to the injured workman, the owner or general contractor cannot escape liability for accidents caused by his subcontractor or supplier. All that would be changed by applying the *Dole-Dow* doctrine uniformly is that, under familiar common-law principles, full indemnification can be recovered from the actor who caused the accident (the active tort-feasor), and, where the cause is shared, contribution under the *Dole-Dow* doctrine" *(Kelly v Diesel Constr. Div. of Carl A. Morse, Inc., supra,* pp 4-7).

As the owner and general contractor delegated the duty under section 240 of the Labor Law to the concrete subcontractor, the "S. & S." defendants, then under common-law indemnification, or by way of contractual indemnification, there would be no *Dole-Dow* apportionment of damages respecting the liability over of the subcontractor to the owner and general contractor (see *Rogers v Dorchester Assoc.,* 32 NY2d 553, 563, 565-566; *Haman v Humble Oil & Refining Co.,* 34 NY2d 557, 569). It has been recognized that "[i]ndemnity \* \* \* 'is not dependent upon the legislative will. It springs from contract, express or implied, and full, not partial, reimbursement is sought' *(McFall v Compagnie Mar. Belge,* [304

NY 314, 328]. Since indemnity involved a shifting rather than an apportionment 'of culpability among wrongdoers' *(Dole v Dow Chem. Co., supra,* at p 147) the policy objections to contribution posed no bar to a suit for indemnity. Thus the courts would enforce a defendant's right to indemnity if it could be shown that the entire loss should be borne by another. In the absence of an express contractual agreement the courts recognized 'an implied contract of indemnity * * * in favor of the wrongdoer who has been guilty of passive negligence * * * against the one who has been actively negligent. The actively negligent tort-feasor is considered the primary or principle wrongdoer and is held responsible for his negligent act not only to the person directly injured thereby, but also to any other person indirectly harmed by being cast in damages by operation of law for the wrongful act' *(McFall, supra,* at p 328)" *(Rock v Reid-Prentice Div. of Package Mach. Co.,* 39 NY2d 34, 39).[4] Having been found after trial to be passively negligent, the owner and the general contractor (the secondary wrongdoers) are entitled to common-law indemnification against the actively negligent tort-feasor (the primary wrongdoer). No contention is advanced by the concrete subcontractor, the general contractor or the owner that contractual indemnification by virtue of article XXIII of the subcontract between the general contractor and the concrete subcontractor, dated September 7, 1971, and the agreement between the owner and the general contractor, is not present. The presence of such contractual indemnification does not under the circumstances presented by this record serve to forestall imposition of common-law indemnification. Both the owner and the general contractor asserted cross claims based on common-law indemnification *and* contractual indemnification. After trial, those claims culminated in a determination (interlocutory judgment entered June 4, 1975) granting contractual indemnity to the owner from the general contractor and to the general contractor from the "S. & S." defendants (subcontractor) and granting common-law indemnity to both the owner and the general contractor from the active tort-feasors.

As the presence of contractual indemnification is not dis-

---

4. In the area of indemnification, the *Dole* case as regards semantics merely substituted for the active-passive terminology that of the primary-secondary analysis. In other words, the actively negligent tort-feasor is considered the primary wrongdoer and the passively negligent tort-feasor is considered the secondary wrongdoer (see *Rogers v Dorchester Assoc.,* 32 NY2d 553, 564).

puted, it being urged only that such indemnification prevents imposition of common-law indemnification which contention has been found meritless, we consider the next issue raised on appeal, to wit, the imposition on Harrington and the subcontractor of liability arising from the breach of the duty imposed by section 240 of the Labor Law, which duty was delegated to the concrete subcontractor by the owner and general contractor. "The statute which restricts liability of a complying employer to the liability prescribed by the Workmen's Compensation Law speaks in terms of liability *on account of the injury or death of the employee.* It does not preclude an action which is not on account of such injury or death but is one in which a third party asserts his own right of recovery *for breach of an independent duty* or obligation owed to him by the employer. Breach of such a duty or obligation is a sufficient basis for an action to recover indemnity from the employer for the amount paid by the third party for the injury or death of the employee even though the employer is thus made liable indirectly in an amount which could not be recovered directly, and even though the employer has paid compensation to the employee" (65 NY Jur, Workmen's Compensation, § 94; emphasis supplied). Liability is fixed upon the owner and the general contractor herein not by virtue of common-law negligence, but by virtue of their first instance liability under subdivision 1 of section 240 of the Labor law that is, by virtue of the "nondelegable" duty imposed upon them by said statute. This duty was delegated by the owner to the contractor who in turn delegated it to the subcontractor. The subcontractor stands liable for breach of *this duty,* not on account of the injury of Ryan and the death of Carinha.[5] Pursuant to the work which the subcontractor expressly agreed to perform for the general contractor as delineated in their agreement, there devolved upon the subcontractor the duty placed upon the owner and general contractor under subdivision 1 of section 240 of the Labor Law. This duty was not delegated by way of a contractual arrangement to Harrington. He was not an independent contractor, but an employee or servant in the special employ of the subcontractor. The subcontractor is liable *in full* to the general contractor and the owner for breach of the duty which it, not its servant, owed. It is well

---

5. It is noted that the common-law negligence claims of the plaintiffs against the owner and general contractor were dismissed. The owner and general contractor are not suing for the damages sustained by the employees Ryan and Carinha, the decedent (see *Putvin v Buffalo Elec. Co.,* 5 NY2d 447).

recognized that "[i]f a corporation is vicariously liable for the acts of its employee, there can be no unequal apportionment of liability between corporation and employee since there was but a single wrong. *(Martindale v. Griffin,* 233 App Div 510, affd. 259 N. Y. 530; *Kinsey v. Spencer & Son Corp.,* 165 Misc. 143, affd. 255 App. Div. 995, affd. 281 N. Y. 601.)" *(Estate of Canale v Binghamton Amusement Co.,* 45 AD2d 424, 427.) As aptly noted in *Rogers v Dorchester Assoc.* (32 NY2d 553, 565-566, *supra),* referring to the rule in *Dole v Dow Chem. Co. (supra)* "[i]t was hardly intended to overturn basic and satisfactory principles of common-law indemnification between vicariously liable tort-feasors and tort-feasors guilty of the acts or omissions causing the harm. In short, the *apportionment rule* applies to those who in fact share responsibility for causing the accident or harm, and *does not extend further to those who are only vicariously liable, as the employer of a negligent employee"* (emphasis supplied). The concrete subcontractor here was vicariously liable for the negligence of its employees Garrido and Harrington. Indeed, the subcontractor through its *foreman* Garrido supervised the initial placement of the crane and was charged with the responsibility inherent in the power to control, to fulfill the mandate of the Labor Law in the placement and operation of the crane so as to give proper protection to its workmen, which responsibility was not fulfilled. It is beyond cavil that "[t]he servant is liable to the master for damages the master has been compelled to pay to third persons because of the negligent and wrongful act of the servant *where the master himself is not at fault"* (37 NY Jur, Master and Servant, § 152, emphasis supplied; see 1B Warren, Negligence, p 667; see, also, *Opper v Tripp Lake Estates,* 274 App Div 422, affd 300 NY 572). Here, the "S. & S." defendants (the concrete subcontractor) in their capacity as master were at fault.

In conclusion and in response to the majority, it is not merely the directive of Garrido, the foreman, as to the placement of the crane which invokes the special employment of Harrington by the "S. & S." defendants. On this record it is patent and irrefutable that at the time of the accident Harrington was in the special employ of the "S. & S." defendants and subject to their supreme control. This is demonstrated by the clear terms of the contract between defendant Action Crane Corp. and the "S. & S." defendants, the undisputed circumstances occurring at the job site upon Harrington's arrival, the prior course of conduct between Action and the

"S. & S." defendants and the custom and usage in the trade. The record must be viewed as a whole. Seizure of an isolated fact to support a legal conclusion, coupled with an absence of acknowledgment of other relevant and undisputed facts, is not conducive to proper resolution of the special employment issue. The issue is whether Harrington, on this record and as a matter of law, was properly found to be in the special employ of the "S. & S." defendants at the time of the accident and subject to their supreme control and direction. It is not merely whether he was in the employ of Action because he could be in the general employ of that defendant and at the same time in the special employ of other defendants. To reiterate: "In determining whether the general master of a servant or one by whom the servant is borrowed or hired is responsible for the servant's acts, the person deemed the master is he who has the supreme choice, control, and direction of the servant, and whose will the servant represents not merely in the ultimate result of his work, but in all its details" (37 NY Jur, Master and Servant, § 154, *supra*). To view Harrington as being subject to the directions and instructions of the "S. & S." defendants *only after the crane had been properly placed* in a safe and stable position, ready to do the work for which it was hired and for which the operator was furnished by Action" (emphasis supplied) ignores the contract terms and the undisputed facts which evince clear and sole control by the "S. & S." defendants from the moment Harrington reported *at the job site.* We cannot rewrite the terms of the contract or manipulate facts. The record speaks most eloquently for itself in proclaiming that it may not be said that the experience and able Trial Justice erred in dismissing plaintiffs' complaint against Action Crane Corp. at the end of the entire case.

Again, to reiterate, the corporate veils of the three "S. & S." defendants were not pierced. Their respective entities are observed. However, again the record proclaims the propriety of holding these three separate entities to be a single unit in *legal* contemplation. Where each corporation is so related to, or organized, or controlled by, the other as to be its mere agent, instrumentality, or *alter ego* as is clearly demonstrated on this record, the corporations must be viewed as one in legal contemplation.

Finally, *Stone v Bigley Bros.* (309 NY 132) cited by Presiding Justice MURPHY is inapposite. In that case a steel com-

pany entered into a contract with a trucking corporation for the transportation of steel to a bridge site with the steel company to do the unloading at the site. When the truck arrived at the site and an employee of the steel company took over direction of the unloading, the trucking corporation's driver opened up the chains encircling the steel to the truck without waiting for the hoisting apparatus to put a strain on the steel. As a result, some of the steel fell off the truck and injured the plaintiff. On that record it was held that it could not be concluded as a matter of law that the truck driver had completely passed from the control of his own employer, the trucking corporation, into the employment of the steel company. The key was the surrender of command and control and on that bare record there was nothing to show that the driver's employer ever turned the driver over to the steel company. A jury, therefore, might *with reason* conclude that the unlocking of the chains, while a necessary preliminary to the unloading, was also a necessary incident of the handling of the truck and its equipment in the transportation operation. In the instant case, both the terms of the contract, which it must be noted, was a lease of the crane, the exercise of control by the lessee over the crane operator pursuant to the lease agreement, the prior cause of conduct between the lessor and the lessee and the custom and usage in the trade unequivocally demonstrate that the only reasoned conclusion is that at the time of the accident the crane operator was turned over to and under the supreme control of the lessee subcontractor, the "S. & S." defendants.

In summary, we are not concerned with the delivery of the crane to the job site, but with its operation *at the job site.* The crane was leased by "S. & S.", the concrete subcontractor, for use *at the job site.* In operating the crane *at the job site,* Harrington was representing and serving the will of "S. & S.", not of Action. If upon delivery to the job site, the crane remained idle, Action would be totally unconcerned. The use of the crane was of import to "S. & S." and constituted the *sine qua non* for its rental of the crane. Action did not retain the use of the crane *at the job site.* The direction for the placement of the crane *at the job site* issued from the supervisory employee of "S. & S.", not from Action. Control *at the job site* was exercised by "S. & S.", not by Action. Indeed, when the accident occurred, the crane was being used in the hoisting of a bucket of concrete, a necessary incident to the lease of

the crane to "S. & S." for employment *at the job site* and not a necessary incident to the delivery by Action of the crane to the job site for such use by "S. & S." The undisputed facts and the documentary evidence show beyond peradventure that the crane lessor, Action, turned the crane operator, Harrington, over to the crane lessee, the "S. & S." defendants.

Accordingly, the judgment of the Supreme Court, New York County (CHIMERA, J.), entered March 12, 1975, dismissing the plaintiffs' action and all cross claims and cross complaints against the defendant Action Crane Corp. should be affirmed and the interlocutory judgment of said court (CHIMERA, J.) entered June 4, 1975, after a jury trial, which, *inter alia,* dismissed the plaintiffs' action and all cross claims and cross complaints against defendant Drott Co., dismissed plaintiffs' action against defendants John Harrington, Plainview S. & S. Concrete Co., Inc., S. & S. Concrete Corp. and Westbury S. & S. Concrete Co., Inc; dismissed plaintiffs' action in common-law negligence against defendants Turner Construction Co. and GEICO, but directed a verdict in favor of the plaintiffs against these latter two defendants by reason of section 240 of the Labor Law, modified on the law to the extent of vacating that part thereof which apportioned damages between defendants John Harrington and the "S. & S." corporations and directing instead that the "S. & S." corporations bear full common-law indemnity to GEICO and Turner Construction Co. and as so modified, the judgment should be affirmed with costs and disbursements.

LANE, J. concurs with CAPOZZOLI, J.; LUPIANO and MARKEWICH, JJ., dissent in an opinion by LUPIANO, J.; MURPHY, P. J., concurs in part and dissents in part in an opinion.

Judgment, Supreme Court, New York County, entered on March 12, 1975, modified, on the law and on the facts, to the extent of reversing so much thereof as (1) dismisses the complaint against defendant Action Crane Corporation, and (2) dismisses the cross complaints and cross claims of defendants, Turner Construction Company, Harrington, Plainview S. & S. Concrete Co., Inc., GEICO, S. & S. Concrete Corporation and Westbury S. & S. Concrete Company, Inc., against Action Crane Corporation; the interlocutory judgment of said court entered on June 4, 1975 is modified, on the law, and on the facts, to the extent of reversing so much thereof, as (1) dismisses plaintiffs' complaint against defendant Harrington,

based upon sections 11 and 29 of the Workmen's Compensation Law; (2) awards judgment to Turner and GEICO against Plainview, S. & S. and Westbury based upon common-law indemnity and (3) apportions damages between Plainview, Harrington, S. & S. and Westbury, and a new trial ordered on the issues remaining. As modified the judgments are affirmed with one bill of $60 costs and disbursements of these appeals to plaintiffs as against defendants Turner and GEICO, and $60 costs and disbursements to abide the event as to the other litigants.